1   Andrew J. Tine, MASBN 633639 *(Pro Hac Vice)*
    **LAW OFFICES OF ANDREW J. TINE**
2   251 Thames Street, 2nd Floor
    Bristol, RI 02809
3   Tel: 401.396.9002
    Fax: 401.396.9479
4   Email: atine@tinelaw.com
5

6   J A N I S   L A W   G R O U P
    **A PROFESSIONAL CORPORATION**
7   Dean T. Janis (CSB 144791)
    550 West C Street, Suite 2000
8   San Diego, CA 92101
    Telephone: 619.814.3525
9   Facsimile:  619.955.5318

10  Attorneys for Plaintiffs
    Robert Albergo and David Irwin
11

12
13                  UNITED STATES DISTRICT COURT

14              SOUTHERN DISTRICT OF CALIFORNIA

15

16  | ROBERT ALBERGO,  an individual, | CASE NO. __09cv2653 DMS AJB __ |
    | and DAVID IRWIN, an individual, | |
17  | | **FIRST AMENDED COMPLAINT FOR:** |
    |         Plaintiffs, | 1)  **VIOLATION OF SECURITIES** |
18  | | **EXCHANGE ACT;** |
    |         v. | 2)  **FRAUD AND FRAUD IN THE** |
19  | | **INDUCEMENT;** |
    | IMMUNOSYN CORPORATION, a | 3)  **BREACH OF CONTRACT;** |
20  | Delaware corporation, ARGYLL | 4)  **VIOLATION OF RICO;** |
    | BIOTECHNOLOGIES, LLC, a Texas limited | 5)  **CONSPIRACY TO VIOLATE RICO;** |
21  | liability company, JAMES T. MICELI, an | 6)  **CIVIL CONSPIRACY;** |
    | individual, DOUGLAS A. | 7)  **UNJUST ENRICHMENT; AND** |
22  | MCCLAIN, JR., an individual, ARGYLL | 8)   **FRAUDULENT CONVEYANCE** |
    | EQUITIES, LLC, a Texas limited liability | |
23  | company, STEPHEN FERRONE, an | |
    | individual, DOUGLAS A. MCCLAIN, SR., | |
24  | an individual, THOMAS ROAD COMPANY, | |
    | and DONA MICELI, an individual, | |
25  | | |
    |         Defendants. | |
26

27

28

1    Now come plaintiffs ROBERT ALBERGO and DAVID IRWIN (collectively,

2    "PLAINTIFFS") and for their first amended complaint against IMMUNOSYN

3    CORPORATION, ARGYLL  BIOTECHNOLOGIES, LLC, JAMES T. MICELI, DOUGLAS A.

4    MCCLAIN, JR., ARGYLL EQUITIES, LLC, STEPHEN FERRONE, DOUGLAS A.

5    MCCLAIN, SR., THOMAS ROAD COMPANY, and DONA MICELI (collectively,

6    "DEFENDANTS") state as follows:

7               **Parties**

8    1.      Plaintiff, Dr. Robert Albergo ("ALBERGO"), is a resident of Florida.

9    2.      Plaintiff, David Irwin ("IRWIN"), is a resident of Florida.

10    3.      Defendant, Immunosyn Corporation ("IMMUNOSYN"), is a Delaware

11    corporation with its principal place of business at 10815 Rancho Bernado Road, Suite 101, San

12    Diego, California.

13    4.      Defendant, Argyll Biotechnologies, LLC ("ARGYLL BIOTECH"), is a Texas

14    limited liability company with its principal place of business at 10815 Rancho Bernado Road,

15    Suite 101, San Diego, California.

16    5.      Defendant, Argyll Equities, LLC ("ARGYLL EQUITIES"), is a Texas limited

17    liability company, with its principal place of business at 10815 Rancho Bernardo Road, Suite

18    101, San Diego, California.

19    6.      Defendant, James T. Miceli ("MICELI"), is a resident of California.  MICELI is

20    the Chief Executive Officer of ARGYLL BIOTECH and ARGYLL EQUITIES.

21    7.      Defendant, Douglas A. McClain, Jr. ("MCCLAIN, JR."), is a resident of Georgia.

22    MCCLAIN is the President of ARGYLL BIOTECH and ARGYLL EQUITIES and the Chief

23    Financial Officer of IMMUNOSYN.

24    8.      Defendant, Stephen Ferrone ("FERRONE"), is a resident of Illinois and/or

25    California.  FERRONE is the President of IMMUNOSYN.

26    9.      Defendant, Douglas A. McClain, Sr. ("MCCLAIN SR.") is a resident of Texas.

27    MCCLAIN SR. is an owner and/or controlling person with respect to ARGYLL EQUITIES

28

1   and/or ARGYLL BIOTECH and holds himself out to be ARGYLL BIOTECH's Chief Science

2   Officer.

3        10.    Defendant, Thomas Road Company ("THOMAS ROAD CO."), is a shell

4   company, wholly owned and controlled by James T. Miceli.

5        11.    Defendant, Dona Miceli ("DONA MICELI), is a resident of California and the

6   wife of James T. Miceli.

7   <center>**Jurisdiction and Venue**</center>

8        12.    This action is brought personally by PLAINTIFFS pursuant to the Securities

9   Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78m, 78r and 78t and RICO statute 18

10  U.S.C. § 1964 *et seq.*  Jurisdiction of this court and venue in this district are proper pursuant to

11  15 U.S.C. § 78aa and 18 U.S.C. § 1964 *et seq.*  Further, jurisdiction is conferred under 15 U.S.C.

12  § 1332(a)(1) because PLAINTIFFS and DEFENDANTS are citizens of different states and the

13  amount in controversy exceeds $75,000 in damages.

14  <center>**Governing Law**</center>

15       13.    Pursuant to 15 U.S.C. § 78m, IMMUNYSON and its principals are required to

16  maintain public filings and books and records for the benefit of investors that accurately and

17  fairly reflect the transactions and dispositions of the assets of the issuer and maintain financial

18  records that conform with generally accepted accounting principles.

19       14.    Pursuant to 15 U.S.C. § 78r (a), "Any person who shall make or cause to be made

20  any statement in any application, report, or document filed pursuant to this chapter or any rule or

21  regulation thereunder or any undertaking contained in a registration statement as provided in

22  subsection (d) of section 78o of this title, which statement was at the time and in the light of the

23  circumstances under which it was made false or misleading with respect to any material fact,

24  shall be liable to any person (not knowing that such statement was false or misleading) who, in

25  reliance upon such statement, shall have purchased or sold a security at a price which was

26  affected by such statement, for damages caused by such reliance, unless the person sued shall

27  prove that he acted in good faith and had no knowledge that such statement was false or

28

<center>3</center>

misleading. A person seeking to enforce such liability may sue at law or in equity in any court of competent jurisdiction. In any such suit the court may, in its discretion, require an undertaking for the payment of the costs of such suit, and assess reasonable costs, including reasonable attorneys' fees, against either party litigant."

15.    Pursuant to 15 U.S.C. § 78t (a) and (b), "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  "It shall be unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this chapter or any rule or regulation thereunder through or by means of any other person."

16.    Pursuant to 17 C.F.R. § 240.10b-5, "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17.    Pursuant to 18 U.S.C. § 1964 (c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.

18.     Pursuant to 18 U.S.C. § 1962 **(a)** It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.  Pursuant to 18 U.S.C. § 1962 **(c)** It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.  Racketeering is defined by Section 1961 and includes mail fraud.

**Background of the Defendants and Corporate Entities**

19.     On or about January 15, 1999, MICELI, MCCLAIN, SR. and MCCLAIN, JR. entered into a written partnership agreement, "for the purpose of devising, creating, designing, pursuing, formulating, enacting and engaging in all companies, corporations, partnerships or legal entities which are or have been or will be used by the parties for the purpose of creating any income or tangible item recognized as having value foreign or domestic" with a term of "fifteen years." (hereinafter the "Partnership Agreement").

20.     On or about August 26, 1999, MICELI was convicted of felony money laundering, forgery, perjury and theft over $100,000 in the State of Illinois.

21.     MCCLAIN, SR., MCCLAIN and MICELI worked together at International Profit Associates ("IPA") in Illinois.

22.     Through IPA, MCCLAIN SR. became involved with a public entity known as Nextpath Technologies.  MCCLAIN SR. was able to obtain and sell a large volume of shares of Nextpath Technologies to unsuspecting investors, based on false information concerning the company, for approximately $6,000,000.

23.    MCCLAIN SR. received funds and/or distributed Nextpath Technologies stock certificates through the US mail or other carriers interstate to unsuspecting investors.

24.    MCCLAIN SR. communicated with prospective investors over the telephone interstate, to convince and deceive them into purchasing Nextpath Technologies stock.

25.    Salvatore and Frank Bramante (hereinafter the "Bramanates") were investors duped by MCCLAIN SR. to buy Nextpath Technologies stock based upon false and misleading information.

26.    The Bramantes were promised unrestricted stock in Nextpath Technologies, a public company, but after much delay, were provided with restricted stock by MCCLAIN, SR.

27.    The Bramantes sued MCCLAIN, SR. in United States District Court for the District of Massachusetts and obtained judgment against him for about $4,500,000.

28.    After MCCLAIN, SR.'s involvement with Nextpath Technologies, MCCLAIN, SR., MCCLAIN, JR. and MICELI left IPA and worked together in an entity called FIT Management.

29.    Money from the sale of Nexthpath Technologies stock was used to finance the start of FIT Management.  FIT Management financed the start of ARGYLL EQUITIES.

30.    As a result of numerous civil judgments against FIT Management and/or MCCLAIN, SR., MCCLAIN, SR. did not publically own ARGYLL EQUITIES, but instead operated for the company as a consultant and secret owner.

31.    ARGYLL EQUITIES had the appearance of a legitimate financial/stock lender, but operated more akin to a Ponzi scheme, as described in a lawsuit brought by Gerald W. Schlief, Southern District of Texas, Houston Division, C.A. No. 08-cv-2128.  The Gerald W. Schlief lawsuit alleges that MICELI, MCCLAIN SR. and others violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") and committed numerous racketeering activities.  The Complaint filed by Gerald W. Schlief is incorporated herein by reference.

32.     ARGYLL EQUITIES was used to defraud several investors and/or companies, including but not limited to Gerald W. Schlief, Siko Venture Limited, Louis D. Paolino, Jr., and Servicios Directivos Servia, S.A. de C.V.   Each of these persons/entities brought civil lawsuits against ARGYLL EQUITIES.

33.     Upon information and belief, numerous unsatisfied civil judgments exist against ARGYLL EQUITIES, FIT Management, and MCCLAIN, SR. for fraud, the Ponzi scheme described in the Gerald Schlief Complaint, securities fraud and/or stock lending fraud.

34.     During ARGYLL EQUITIES' demise as a reputable and financially stable company, through numerous lawsuits and judgments entering against it, ARGYLL EQUITIES' financed the start up of ARGYLL BIOTECH.

35.     ARGYLL BIOTECH and/or ARGYLL EQUITIES financed the start up of IMMUNOSYN and financially control IMMUNOSYN.

36.     At all relevant time hereto, ARGYLL BIOTECH claimed to own, develop, and promote a drug called SF-1019.

37.     At all relevant times hereto, IMMUNOSYN claimed in its SEC filings and website to own the exclusive rights to market and sell SF-1019.

38.     Similar to MCCLAIN, SR.'s false and misleading promotion and sale of Nextpath Technologies stock, the DEFENDANTS have engaged in the false and misleading promotion of IMMUNOSYN stock, for financial gain, to the detriment of others.

39.     The DEFENDANTS have been promoting IMMUNOSYN stock through various mediums so that they may sell their own stock at a great profit, while investors, such as PLAINTIFFS were unable to sell their stock because it was restricted.

40.     Upon information and belief, the DEFENDANTS, personally or through entities that they control, have sold IMMUNOSYN stock from April 2007 through the present totaling more than $14,000,000.

41.     The DEFENDANTS were engaged in a scheme to sell SF-1019 for their own financial gain outside of the exclusive license held by the publically traded company they control, IMMUNOSYN.

42.     The DEFENDANTS distributed SF-1019 and IMMUNOSYN stock certificates interstate through the US mail or other carriers.

43.     The DEFENDANTS used email, websites and telephone communications to sell SF-1019 interstate.

44.     MICELI, MCCLAIN, SR., and MCCLAIN, JR. have been personally involved in the distribution of SF-1019 throughout the United States.

45.     MICELI, MCCLAIN, SR., and MCCLAIN, JR. have been personally involved in the retention of profits from the sale of SF-1019.

46.     MICELI, MCCLAIN, SR., and MCCLAIN, JR. have been personally involved in the development of media statements and promotional statements made on their companies' websites concerning SF-1019.

47.     MICELI, MCCLAIN, SR., and MCCLAIN. JR. control ARGYLL EQUITIES, ARGYLL BIOTECH and IMMUNOSYN.

48.     MICELI, MCCLAIN, SR., and MCCLAIN, JR. have financially stripped ARGYLL EQUITIES and ARGYLL BIOTECH of assets purposely and through the judgments rendered against said companies due to their active fraud.  Prior to leaving ARGYLL EQUITIES and ARGYLL BIOTECH "judgment proof," said entities were used by MICELI, MCCLAIN, SR. and MCCLAIN, JR. to commit fraud upon the PLAINTIFFS.

49.     With respect to the operation of ARGYLL EQUITIES and ARGYLL BIOTECH, MICELI, MCCLAIN, SR., and MCCLAIN. JR. have failed to follow corporate formalities, segregate their personal assets from business assets, and make required tax filings for money received by them from the companies and money paid to employees, consultants, and 1099 labor.

JANIS LAW GROUP, APC   FIRST AMENDED COMPLAINT

1    50.    MICELI, MCCLAIN, SR., and MCCLAIN, JR. are the alter egos of ARGYLL

2    EQUITIES and ARGYLL BIOTECH.

3                        **The Fraud Upon the Plaintiffs**

4    51.    In early 2006, ALBERGO was introduced by Dr. Jochen Brenner to MICELI and

5    MCCLAIN, SR.

6    52.    In early 2006, through a series of telephone calls and mailings between MICELI

7    and/or MCCLAIN, SR. on the one hand, and ALBERGO on the other hand, ALBERGO was

8    convinced by MICELI and MCCLAIN, SR. that he should make a financial investment in a start-

9    up company because the start-up company had an exclusive right to sell a super drug called SF-

10   1019.

11   53.    During these initial telephone calls with ALBERGO related to the efficacy of SF-

12   1019, MCCLAIN, SR. held himself out to be the Chief Science Officer of ARGYLL BIOTECH

13   and a **medical doctor** trained in England.

14   54.    MCCLAIN, SR. and MICELI told ALBERGO that the start-up company was the

15   next Google and that SF-1019 cured multiple sclerosis and diabetic skin ulcers.

16   55.    MCCLAIN, SR. and MICELI told ALBERGO that they had studies to

17   conclusively prove the effectiveness of SF-1019, but that the studies were not yet ready for

18   publication.

19   56.    MCCLAIN, SR. and MICELI told ALBERGO that SF-1019 had no side effects

20   and that it was totally safe.

21   57.    MCCLAIN, SR. and MICELI told ALBERGO that the money they wanted him to

22   invest would be used to fund the start-up operations.

23   58.    MCCLAIN, SR. and MICELI told ALBERGO that the start-up company would

24   definitely be listed on the NASDAQ shortly after its public offering.

25   59.    MCCLAIN, SR. and MICELI told ALBERGO that an Osmond family member

26   had invested millions of dollars in the start-up company and that one of the Osmond brothers'

27   multiple sclerosis was dramatically improved by taking SF-1019.

28

60.     MCCLAIN, SR. also claimed to ALBERGO that studies had been completed in Utah and Mexico on SF-1019 with "unbelievable success."

61.     MCCLAIN, SR. and MICELI told ALBERGO that SF-1019 would be given orphan status because of its effectiveness and that such would lead to expedited FDA approval.

62.     MCCLAIN, SR. also claimed that SF-1019 was going to be approved in Malaysia in the short term.

63.     MCCLAIN, SR. and MICELI told ALBERGO that he would receive stock certificates in the start-up company shortly after making his investment.

64.     Prior to making his purchase, MCCLAIN, SR. and MICELI told ALBERGO that he could buy the stock at $10/share, but that the opening price of the stock would be $15.50/share.

65.     On or about March 13, 2006, ALBERGO signed two documents entitled "Agreement for the Purchase of Common Stock," to purchase sixty thousand shares of unrestricted stock in a company to be called "Nurovysn Biotech Corporation" for $600,0000 from a company called Argyll Equities, LLC (hereinafter "First Argyll Contracts").

66.     On or about March 13, 2006, relying upon the representations of MICELI and MCCLAIN, SR., ALBERGO paid $600,000 to ARGYLL EQUITIES pursuant to the First Argyll Contracts.

67.     Pursuant to the First Argyll Contracts, ARGYLL EQUITIES was to "sell, transfer and assign" sixty thousand shares of "free-trading shares of common stock in Nurovysn Biotech Corporation" to ALBERGO within 45 days of receipt of the purchase funds.

68.     On or about March 24, 2006, relying upon the representations of MICELI, MCCLAIN, SR. and Mr. Brenner, ALBERGO paid $400,000 to Mr. Brenner via wire transfer for an additional 40,000 shares of unrestricted stock in "Nurovysn Biotoech Corporation" bringing his total investment in the company to $1,000,000.

69.     ALBERGO was not provided with any SEC filings for Nurovysn Biotoech Corporation prior to making his purchase of 100,000 shares.

70.     ARGYLL EQUITIES breached the First Argyll Contracts by failing to deliver any of the free-trading shares of common stock to ALBERGO within 45 days of receipt of ALBERGO's purchase funds.

71.     In early 2006, Dr. Jochen Brenner represented to IRWIN that he was selling stock in a company called Nurovysn Biotech Corporation that was the sole licensee of a new wonder drug.

72.     Based upon representations by Dr. Brenner that Nurovysn Biotech Corporatoin (nka IMMUNOSYN) had exclusive rights to make and sell a new drug that cured severe cases of diabetes, statistical studies and doctor's recommendations presented by Dr. Brenner to IRWIN, the imminent nature of the success of the new company as represented to IRWIN by Dr. Brenner, and the representation that the stock could be bought for $10/share but would go public for $15.50/share, IRWIN purchased $25,000 worth of stock in the start-up company from ARGYLL EQUITIES pursuant to a written agreement.

73.     Prior to IRWIN's purchase on or about April 2006, Dr. Brenner represented to IRWIN that the company first identified as Nurovysn Biotech Corporation (nka IMMUNOSYN) would obtain approval for the sale of SF-1019 in the United States in 1 to 2 weeks and that the stock would be trading in the same time frame.

74.     MCCLAIN, SR. and MICELI have used Dr. Brenner as an agent to promote and sell Nurovysn Biotech Corporation (nka IMMUNOSYN) stock and to further their goals as set forth in the written "Partnership Agreement."

75.     Dr. Brenner disclosed to IRWIN that he was selling stock for ARGYLL EQUITIES and that the information he was providing to IRWIN came from MCCLAIN, SR. and MICELLI.

76.     On or about April 2006, relying upon the representations of Dr. Brenner, IRWIN paid $25,000 to ARGYLL EQUITIES for stock in a company called Nurovysn Biotech Corporation (nka IMMUNOSYN).

77.     From March-April 2006 through to the present, MCCLAIN, SR. has continued to

11

promote SF-1019, claiming its imminent success and that the stock is about to "take off."

78.     On March 26, 2007, prior to the receipt of the stock certificates by IRWIN and ALBERGO, Dr. Brenner represented to IRWIN and ALBERGO, based upon information supplied by MCCLAIN, SR. and MICELI, that SF-1019 was approved for sale in Canada and that orders had been received for 130,000 vials per month at $200.00/vial and that the stock would be cleared for trading on April 3, 2007.

79.     On or about May 7, 2007, IRWIN and ALBERGO received a letter from MICELI enclosing copies of the long promised stock certificates for the purchases made in 2006.  The May 7, 2007 letter required that IRWIN and ALBERGO sign a Stock Purchase Agreement to receive their original certificates (the "Second Argyll Contracts").

80.     The Second Argyll Contracts contained terms and conditions not set forth in the First Argyll Contracts.  ARGYLL EQUITIES and MICELI pulled a bait and switch by now disclosing in the pages within the Second Argyll Contracts that the shares of stock being purchased by ALBERGO and IRWIN were restricted stock and by providing reference to SEC filings that were not entirely consistent with the prior and ongoing representations being made to ALBERGO and IRWIN.  The SEC filings were not alarming to ALBERGO and IRWIN to the extent inconsistent with the verbal representation being made to them because MICELI, MCCLAIN, SR. and/or Dr. Brenner were representing to ALBERGO and IRWIN that the positive information available to them could not yet be made available to the public.

81.     Based upon the representations *supra*, the repeated representations as to the imminent success of IMMUNOSYN and the efficacy of SF-1019, and given the requirement that they sign the Second Argyll Contracts to receive their original stock certificates that had been paid for approximately a full year prior, IRWIN and ALBERGO executed the Second Argyll Contracts.

82.     Upon information and belief, one or more of the DEFENDANTS are selling SF-1019 in the United States and/or Mexico.

83.     Upon information and belief, one or more of the DEFENDANTS are distributing

1    SF-1019 in the United States and/or Mexico.

2         84.     Upon information and belief, Alan Osmond is paid by one or more of the

3    DEFENDANTS to promote SF-1019.

4         85.     IMMUNOSYN claims in its SEC filings, signed by FERRONE and MCCLAIN,

5    JR., to have an exclusive worldwide license to market and sell SF-1019.

6         86.     ALBERGO relied upon the aforementioned representations made by MICELI,

7    MCCLAIN, SR., and Dr. Brenner in purchasing IMMUNOSYN stock from them and/or their

8    company, ARGYLL EQUITIES.

9         87.     IRWIN relied upon the aforementioned representations made by Dr. Brenner in

10    purchasing IMMUNOSYN stock from ARGYLL EQUITIES.

11         88.     ALBERGO and IRWIN continued to hold their IMMUNOSYN stock because of

12    the continuing positive representations by MCCLAIN, SR., MICELI, and Dr. Brenner after the

13    purchase of said stock and because of the representations made on IMMUNOSYN's website and

14    ARGYLL BIOTECH's website.

15         89.     Recently, MICELI represented to ALBERGO, IRWIN and others that a New

16    York law firm was involved in the imminent purchase of IMMUNOSYN stock for $20/share (the

17    "Buyout").

18         90.     Separately, IMMUNOSYN reported that the Buyout was unsubstantiated market

19    rumors.

20         91.     MICELI was personally involved in creating market rumors concerning a Buyout

21    for his own financial gain and to cause ALBERGO, IRWIN and others to continue to hold their

22    IMMUNOSYN stock and to delay legal action against him.

23         92.     IMMUNOSYN has reported no revenue for 2007 and 2008.  IMMUNOSYN's

24    10-Q dated May 15, 2008 claims, "As of the date of this report, we have no revenue and limited

25    operations."  This 10-Q is signed by MCCLAIN and FERRONE.

26         93.     SF-1019 has been sold for a profit and/or revenue in the United States during at

27    least 2008.

28

13

94.     The DEFENDANTS have been selling SF-1019 through various commercial channels, including Dr. Morales in Texas, and the DEFENDANTS have failed to report and/or allocate income to IMMUNOSYN to the detriment of its stockholders, including PLAINTIFFS, in violation of IMMUNOSYN's exclusive right to market and sell SF-1019.

95.     The SEC filings made by IMMUNOSYN, as reported and/or signed by MCCLAIN and FERRONE, have been false and/or misleading because SF-1019 is being sold by the DEFENDANTS.

### COUNT I – THE EXCHANGE ACT

(Against MICELI, MCCLAIN, SR., MCCLAIN, JR., IMMUNOSYN, and FERRONE)

96.     PLAINTIFFS hereby incorporate and restate herein the foregoing paragraphs 1-95 as if fully stated herein.

97.     The DEFENDANTS are in violation of 15 U.S.C. § 78r and/or 17 C.F.R. § 240.10b-5 by making false and/or misleading statements concerning IMMUNYSON and SF-1019 in SEC filings, including but not limited to: a) failing to report income generated from the sale of SF-1019, b) claiming in SEC filings made January 3, 2007 that IMMUNYSON had the "exclusive worldwide license to market, distribute and sell . . . SF-1019," and c) failing to disclose that SF-1019 was being sold through channels outside of IMMUNYSON.

98.     ALBERGO and IRWIN relied upon the SEC filings of IMMUNOSYN to accurately report the financials of the company, material events, and the assets/licenses held by IMMUNOSYN.

99.     Based upon *supra* and MCCLAIN, SR. and MICELI's claim that IMMUNOSYN would hold the exclusive license to sell SF-1019, ALBERGO and IRWIN purchased IMMUNOSYN stock from them and/or ARGYLL EQUITIES.

100.    Based upon the SEC filings and DEFENDANTS' representations, ALBERGO and IRWIN believed that SF-1019 could only be sold by IMMUNOSYN and that proceeds from the sale of SF-1019 would flow to IMMUNOSYN.

14

1     101.    Based upon the SEC filings and MCCLAIN, SR.'s continuing representations as

2    to the efficacy of SF-1019, ALBERGO and IRWIN continued to hold their stock and not attempt

3    to sell it.

4     102.    In 2006, when MICELI and MCCLAIN, SR. were attempting to sell

5    IMMUNOSYN stock to ALBERGO and to IRWIN, through Dr. Brenner, neither of them told

6    ALBERGO or IRWIN that the stock would be restricted stock.

7     103.    The stock certificates finally sent to IRWIN and ALBERGO were restricted stock,

8    preventing the sale of said stock under certain conditions.

9     104.    One or more of the DEFENDANTS are selling SF-1019 without any proceeds

10    flowing to IMMUNYSON.

11     105.    MCCLAIN, SR. has personally visited with individuals in California and Utah to

12    arrange for the sale of SF-1019 to them, outside the exclusive license held by IMMUNOSYN.

13     106.    Individuals have been sold SF-1019, as arranged for by MCCLAIN, SR., with the

14    knowledge and consent of MICELI, MCCLAIN, JR., and FERRONE.

15     107.    MCCLAIN, JR. and FERRONE, with knowledge of the sale of SF-1019, have

16    failed to require that income derived from said sales be attributed to IMMUNOSYN, to the

17    detriment of its stockholders, including IRWIN and ALBERGO.

18     108.    MICELI, MCCLAIN, SR., MCCLAIN, JR. and FERRONE are jointly and

19    severally liable for the aforementioned unlawful conduct committed personally or through their

20    control of others.

21     109.    At this time, IMMUNSOYN stock is trading for under a dollar.  The volume

22    being traded would not support the sale of a large volume of shares without further depressing

23    the price.  The stock purchased by ALBERGO and IRWIN is essentially worthless.

24     110.    ALBERGO has suffered approximately $1 million in damages and IRWIN has

25    suffered approximately $25,000 in damages as a result of the DEFENDANTS' violations of the

26    Exchange Act.

27

28

15

FIRST AMENDED COMPLAINT

1    111.    ALBERGO and IRWIN are entitled to compensatory damages in amount to be

2    proven at trial against MICELI, MCCLAIN, SR., MCCLAIN, JR., IMMUNOSYN, and

3    FERRONE, jointly and severally, for their violations of the Exchange Act, plus interest, costs

4    and attorneys fees.

5                    **COUNT II – FRAUD AND FRAUD IN THE INDUCEMENT**

6                    (Against MICELI, MCCLAIN, SR. and ARGYLL EQUITIES, LLC)

7    112.    PLAINTIFFS hereby incorporate and restate herein the foregoing paragraphs 1-

8    111 as if fully stated herein.

9    113.    In violation of common law or statute, MICELI, MCCLAIN, SR., Dr. Brenner ,

10   and through them ARGYLL EQUITIES, LLC, made a number of representations to ALBERGO

11   and IRWIN, *supra* at paragraphs 26 through 66, in order to induce them to purchase

12   IMMUNOSYN stock.

13   114.    The representations made by MICELI, Dr. Brenner, and/or MCCLAIN, SR. at

14   *supra*, were false and/or misleading and MICELI and MCCLAIN, SR. knew said statements

15   were false or misleading when made, because: 1) MCCLAIN, SR. is not a medical doctor, 2) it is

16   not proven that SF-1019 cures multiple sclerosis and diabetic skin ulcers, 3) when stated, no

17   studies existed to conclusively prove the effectiveness of SF-1019, 4) IMMUNOSYN was never

18   listed on the NASDAQ, 5) no Osmond family member invested millions in IMMUNOSYN, 6)

19   SF-1019 was sold outside of IMMUNOSYN's exclusive license, 7) the money paid by

20   ALBERGO was not used for IMMUNOSYN's start-up operations, 8) when stated, there was no

21   proof that SF-1019 had no side effects and that it was totally safe, 9) SF-1019 has not achieved

22   orphan drug status or FDA approval, 10) SF-1019 has not been approved for sale anywhere in

23   the world, 11) no Canadian order was placed for 130,000 vials of SF-1019 per month at

24   $200/vial; 12) the stock opened for trading at $15.00 per share and closed at $9 per share on the

25   opening day; 13) the stock price was being manipulated and inflated by MICELI and

26   MCCLAIN, SR.; and 14) the stock was not cleared for trading on April 3, 2007.

27   115.    The truth behind the representations made by MICELI, Dr. Brenner and

28

16

1   MCCLAIN, SR. was concealed from PLAINTIFFS and such concealment and lack of

2   knowledge by PLAINTIFFS should toll the statute of limitations with respect to said claims of

3   fraud and fraudulent inducement.

4        116.    If PLAINTIFFS had not been provided with false and/or misleading information

5   by MICELI and/or MCCLAIN, SR., they would not have purchased IMMUNOSYN stock from

6   them and/or their company, ARGYLL EQUITIES.

7        117.    ALBERGO reasonably relied upon the DEFENDANTS' material representations

8   in purchasing and continuing to hold IMMUNOSYN stock.

9        118.    As a result of the purchase of stock in IMMUNYSON, ALBERGO has suffered

10  damages in excess of $1 million.

11       119.    IRWIN reasonably relied upon the material representations of Dr. Brenner, all of

12  which proved to be false, in purchasing IMMUNOSYN stock.

13       120.    MICELI and MCCLAIN, SR. knowingly communicated false or misleading

14  information to IRWIN and ALBERGO through Dr. Brenner to induce them to purchase

15  IMMUNOSYN stock.

16       121.    As a result of the purchase of stock in IMMUNYSON, IRWIN suffered damages

17  in excess of $25,000.

18       122.    ALBERGO and IRWIN are entitled to rescission of the First Argyll Contracts and

19  Second Argyll Contracts and restitution of monies paid under said agreements, damages for

20  fraud, including direct, consequential and punitive damages, plus interest, costs and attorneys

21  fees.

22       123.    The conduct of MICELI and MCCLAIN, SR., as alleged above, was oppressive,

23  fraudulent and malicious and was committed willfully and/or with reckless disregard for the

24  rights of PLAINTIFFS, and without just cause or excuse.  Accordingly, PLAINTIFFS are

25  entitled to exemplary damages in an amount to be determined at trial.

26

27

28

1

**COUNT III – BREACH OF CONTRACT**

2

(Against ARGYLL EQUITIES, LLC, MICELI and MCCLAIN, SR.)

3    124.    PLAINTIFFS hereby incorporate and restate herein the foregoing paragraphs 1-

4    123 as if fully stated herein.

5    125.    Based upon the false representations *supra*, PLAINTIFFS entered into the "First

6    Argyll Contracts" and the "Second Argyll Contracts) to purchase stock from ARGYLL

7    EQUITIES in a company first called Nurovysn Biotech Corporation and subsequently known as

8    IMMUNSOYN.

9

**Albergo Contracts**

10    126.    MICELI and MCCLAIN, SR. told ALBERGO that his stock certificates would be

11    delivered to him immediately after his investment, that the stock would go public immediately

12    after his investment and become listed on the NASDAQ, that approvals for SF-1019 would be

13    achieved imminently from the FDA, that his money would be used for the start-up company

14    operations, and that IMMUNOSYN would have the exclusive right to sell SF-1019.

15    127.    The First Argyll Contracts indicated that ALBERGO would receive unrestricted

16    stock in a company called Nurovysn Biotech Corporation.

17    128.    ALBERGO never received the unrestricted stock in Nurovysn Biotech

18    Corporation within the agreed time frame.

19    129.    The Second Argyll Contracts said that ALBERGO would receive restricted stock

20    in a company called IMMUNOSYN.

21    130.    There was no additional consideration for the Second Argyll Contracts.

22    131.    ALBERGO was induced to enter into the Second Argyll Contracts because of the

23    numerous verbal representations set forth *supra* and because he had been out of pocket

24    $1,000,000 for about a year without stock certificates to secure his investment.

25    132.    MICELI and MCCLAIN, SR. breached their oral promises to ALBERGO because

26    *inter alia* he was not timely delivered unrestricted stock certificates, the start-up company

27    (Nurovysn Biotech Corporation or IMMUNOSYN) did not get listed on the NASDAQ, SF-1019

28

18

has not obtained FDA approval, the alleged Canadian orders were not real, his investment was not used exclusively for the start-up company, and IMMUNOSYN was not given the exclusive right to sell SF-1019.

133.    ARGYLL EQUITIES and MICELI breached the First Argyll Contracts by failing to deliver the stock as promised.

134.    MICELI and MCCLAIN, SR. fraudulently induced ALBERGO to enter into the Second Argyll Contracts and breached their oral promises with respect to the use of his investment and the accomplishment of material events, as represented and set forth above.

**Irwin Contracts**

135.    At the direction of, and based on representations by, MICELI and MCCLAIN, SR., Dr. Brenner told IRWIN that his stock certificates would be delivered to him immediately after his investment, that the stock would go public immediately after his investment and become listed on the NASDAQ, that approvals for SF-1019 would be achieved imminently from the FDA, and that IMMUNOSYN would have the exclusive right to sell SF-1019.

136.    Based upon the promises and representations set forth *supra*, IRWIN agreed to pay for stock in a company now known as IMMUNOSYN and ARGYLL EQUITIES agreed to deliver unrestricted stock to him in the new company.

137.    ARGYLL EQUITIES breached the agreement with Irwin by failing to send him unrestricted stock certificates immediately after his investment.

138.    MICELI and MCCLAIN, SR. breached their oral promises made to IRWIN via Dr. Brenner, by failing to take the company public immediately after their investment, by failing to achieve NASDAQ listing, by failing to obtain approvals from the FDA, by failing to use IRWIN's money exclusively for IMMUNOSYN's operations, and by failing to maintain IMMUNOSYN's exclusive right to sell SF-1019.

139.    MICELI and MCCLAIN, SR. induced IRWIN to sign the Second Argyll Contracts based upon continuing misrepresentations through Dr. Brenner, including but not limited to, the representations that the stock would open at $15.50/per share and that the stock

1 │ had been approved for sale in Canada and that an order for 130,000 vials per month at $200/vial

2 │ had been placed.

3 │      140.    PLAINTIFFS have been harmed by MICELI, MCCLAIN. SR. and ARGYLL

4 │ EQUITIES breaches and by the false statements made to induce PLAINTIFFS to enter two

5 │ variations of stock purchase agreements.

6 │      141.    PLAINTIFFS are entitled to damages in amount to be proven at trial against

7 │ MICELI, MCCLAIN, SR., and ARGYLL EQUITIES, LLC. for their breaches, plus interest,

8 │ costs and attorneys fees.

9 │ <div align="center">**COUNT IV – VIOLATION OF RICO**</div>

10 │ <div align="center">(Against MICELI, MCCLAIN, SR. and MCCLAIN, JR.)</div>

11 │      141.    PLAINTIFFS hereby incorporate and restate herein the foregoing paragraphs 1-

12 │ 140 as if fully stated herein.

13 │      142.    MICELI, MCCLAIN, SR. and MCCLAIN, JR., operate as an enterprise through

14 │ various entities as described *supra* and through their association and agreement to make money.

15 │      143.    MICELI, MCCLAIN, SR. and MCCLAIN, JR., have engaged in a pattern of

16 │ racketeering activity, to the detriment of others, including ALBERGO and IRWIN.

17 │      144.    MICELI, MCCLAIN, SR. and MCCLAIN, JR., have engaged in monetary

18 │ transactions (including but not limited to the creation of IMMUNOSYN and ARGYLL

19 │ BIOTECH) with money derived from unlawful activities and/or racketeering activity in prior

20 │ enterprises.

21 │      145.    As a result of the unlawful conduct and RICO violations committed by MICELI,

22 │ MCCLAIN, SR. and MCCLAIN, JR., ALBERGO and IRWIN have been damaged.

23 │      146.    As a result of the unlawful conduct and RICO violations committed by MICELI,

24 │ MCCLAIN, SR. and MCCLAIN, JR., ALBERGO and IRWIN are entitled to compensatory

25 │ damages in an amount to be proven at trial, treble damages, interest, costs and attorneys fees.

26 │

27 │

28 │

FIRST AMENDED COMPLAINT

1    **COUNT V – CONSPIRACY TO VIOLATE RICO**

2    (Against MICELI, MCCLAIN, SR. and MCCLAIN, JR.)

3    147.    PLAINTIFFS hereby incorporate and restate herein the foregoing paragraphs 1-

4    146 as if fully stated herein.

5    148.    RICO prohibits any person from conspiring to violate RICO.

6    149.    MICELI, MCCLAIN, SR. and MCCLAIN, JR. had agreements and/or

7    understandings with each other to engage in racketeering activities.

8    150.    MICELI, MCCLAIN, SR. and MCCLAIN, JR. have committed racketeering

9    activities.

10    151.    ALBERGO and IRWIN were harmed by MICELI, MCCLAIN, SR. and

11    MCCLAIN, JR.'s conspiracy to violate RICO and have suffered actual damages.

12    152.    As a result of MICELI, MCCLAIN, SR. and MCCLAIN, JR.'s unlawful

13    conspiracy to commit RICO violations, ALBERGO and IRWIN are entitled to compensatory

14    damages in an amount to be proven at trial, treble damages, interest, costs and attorneys fees.

15    **COUNT VI – CIVIL CONSPIRACY**

16    (Against All DEFENDANTS)

17    153.    PLAINTIFFS hereby incorporate and restate herein the foregoing paragraphs 1-

18    152 as if fully stated herein.

19    154.    The DEFENDANTS entered into an agreement with each other to commit one or

20    more unlawful acts, including fraud and fraud in the inducement, against ALBERGO and

21    IRWIN.

22    155.    Through the DEFENDANTS' conspiracy and fraud, ALBERGO and IRWIN

23    were sold IMMUNOSYN stock based upon numerous misrepresentations.

24    156.    ALBERGO and IRWIN were harmed by the DEFENDANTS' conspiracy and

25    fraud, and as a result thereof have suffered actual damages.

26    157.    As a consequence of the DEFENDANTS' conspiracy and fraud, ALBERGO and

27    IRWIN are entitled to compensatory damages in an amount to be proven at trial, plus interest,

28

21

1   costs and attorneys fees.

2       158.   The conduct of DEFENDANTS, as alleged above, was oppressive, fraudulent and

3   malicious and was committed willfully and/or with reckless disregard for the rights of

4   PLAINTIFFS, and without just cause or excuse.  Accordingly, PLAINTIFFS are entitled to

5   exemplary damages in an amount to be determined at trial.

6   <div align="center">**COUNT VII – UNJUST ENRICHMENT**</div>

7   <div align="center">(Against MICELI, MCCLAIN, SR. and ARGYLL EQUITIES)</div>

8       159.   PLAINTIFFS hereby incorporate and restate herein the foregoing paragraphs 1-

9   158 as if fully stated herein.

10       160.   MICELI, MCCLAIN, SR. and ARGYLL EQUITIES have been unjustly enriched

11   by the sale of IMMUNYSON stock to ALBERGO and IRWIN to the extent of the profit

12   received from the sale of said stock, and each said DEFENDANT should be required to disgorge

13   that amount.

14       161.   As a consequence, PLAINTIFFS are entitled to compensatory damages in an

15   amount to be proven at trial, plus interest, costs and attorneys fees.

16   <div align="center">**COUNT VIII – FRAUDULENT TRANSFER**</div>

17   <div align="center">(Against THOMAS ROAD COMPANY and DONA MICELI)</div>

18       162.   PLAINTIFFS hereby incorporate and restate herein the foregoing paragraphs 1-

19   139 as if fully stated herein.

20       163.   The THOMAS ROAD COMPANY is the alter ego of MICELI.

21       164.   The THOMAS ROAD COMPANY never performed any work for ARGYLL

22   EQUITIES, yet during 2006 and 2007 it received money from ARGYLL EQUITIES without

23   providing any value in exchange.

24       165.   ARGYLL EQUITIES is insolvent due to substantial judgments being obtained

25   against it by creditors.

26       166.   PLAINTIFFS have been damaged by the fraudulent transfer of money from

27   ARGYLL EQUITIES to THOMAS ROAD COMPANY.

28

1       167.    DONA MICELI never worked for ARGYLL EQUITIES.

2       168.    Since 2006, DONA MICELI received over $1,000,000 from ARGYLL

3 EQUITIES.

4       169.    Assets of ARGYLL EQUITIES have been transferred to DONA MICELI without

5 providing reasonably equivalent value in exchange to ARGYLL EQUITIES and with the intent

6 to hinder and prevent collection by PLAINTIFFS and other creditors.

7       170.    PLAINTIFFS have been damaged by the fraudulent transfer of money from

8 ARGYLL EQUITIES to DONA MICELI.

9       171.    PLAINTIFFS did not have knowledge of the fraudulent transfers to the THOMAS

10 ROAD COMPANY and DONA MICELI until their review of this subject complaint, prior to

11 filing, and said transfers were concealed from them by the DEFENDANTS.

12       171.    PLAINTIFFS did not have knowledge of any judgment against ARGYLL

13 EQUITIES or pending lawsuits against ARGYLL EQUITIES until August of 2009 and said

14 lawsuits and judgments were concealed from them by the DEFENDANTS.

15       172.    The statute of limitations regarding said fraudulent transfers should be tolled, with

16 respect to PLAINTIFFS.

17       173.    As a consequence of the fraudulent transfers to THOMAS ROAD COMPANY

18 and DONA MICELI, PLAINTIFFS are entitled to imposition of a constructive trust over all

19 transferred amounts, compensatory damages in an amount to be proven at trial, plus interest,

20 costs and attorneys fees.

21 <div align="center">**PRAYER FOR RELIEF**</div>

22       **WHEREFORE,** PLAINTIFFS pray for judgment against DEFENDANTS, and each of

23 them, in favor of PLAINTIFFS as follows:

24             On Counts I, III, and VII:

25       1.   For compensatory damages according to proof;

26             On Count II:

27       1.   For rescission and restitution as a result of the fraudulent inducement;

28

<div align="center">23</div>

2.   For compensatory damages according to proof;

3.   For punitive damages;

On Count IV and V:

1.   For compensatory damages according to proof;

2.   For treble damages;

On Count VI:

1.   For compensatory damages according to proof;

2.   For punitive damages;

On Count VIII:

1.   For a constructive trust on all amounts transferred;

2.   For compensatory damages according to proof;

On All Counts:

1.   For a pre-judgment order of attachment against the real and personal property of JAMES MICELI and/or DONA MICELI that may be found and attached to the extent of $600,000 in the State of California;

2.   For prejudgment interest;

3.   For costs of suit incurred herein;

4.   For reasonable attorneys' fees; and

5.   For such other and further relief as the Court deems just and proper.

Dated:  May 3, 2010

**LAW OFFICES OF ANDREW J. TINE**

By: /s/Andrew J. Tine
Andrew J. Tine
251 Thames Street, 2nd Floor
Bristol, RI 02809
Tel: 401.396.9002
Fax: 401.396.9479
Email: atine@tinelaw.com

24

# J A N I S   L A W   G R O U P

### A PROFESSIONAL CORPORATION

By: ____/s/ Dean T. Janis_____
    Dean T. Janis
    JANIS LAW GROUP, APC
    550 West C Street, Suite 2000
    San Diego, CA 92101
    Tel: (619) 814-3526
    Fax: (619) 955-5318
    Email: dean.janis@janislaw.net

    Counsel for Plaintiffs
    ROBERT ALBERGO and DAVID IRWIN

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties below by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

/s/ Andrew J. Tine

JANIS LAW GROUP, APC FIRST AMENDED COMPLAINT