# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT ALBERGO and DAVID IRWIN,<br><br>                   Plaintiffs,<br><br>vs.<br><br>IMMUNOSYN CORPORATION, et al.,<br><br>                   Defendants. | CASE NO. 09CV2653 DMS (AJB)<br><br>**ORDER:**<br><br>**(1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT, AND**<br><br>**(2) GRANTING PLAINTIFFS' MOTION FOR WRIT OF ATTACHMENT**<br><br>[Docs. 17 & 27] |

      Pending before the Court are Defendants' motion to dismiss Plaintiffs' First Amended Complaint ("FAC"), and Plaintiffs' motion for writ of attachment. The matters came on for hearing on August 13, 2010. Andrew Tine and Dean Janis appeared on behalf of Plaintiffs. Todd Atkins appeared on behalf of Defendants. For the reasons set forth below, Defendants' motion to dismiss is granted in part and denied in part. Plaintiffs' motion for writ of attachment is granted.

/ / /

/ / /

/ / /

# I.

# BACKGROUND

Plaintiffs Robert Albergo and David Irwin allege that in early 2006, they were induced to invest a combined $1,025,000 in unrestricted stock of a "start-up" company called Nurovysn Biotech Corporation (now Immunosyn) through Argyll Equities. (FAC ¶ 120.) Plaintiffs claim they did so only after Defendants Douglas McClain, Sr., James Miceli and their agent, Dr. Brenner, made false representations regarding the potential value of the stock. (*Id.* at ¶ 114.) Specifically, Plaintiffs allege they were told Argyll Equities owned the exclusive right to sell a super drug called SF-1019. (*Id.* at ¶ 52.) Defendants asserted SF-1019 "was the next Google" and that studies had shown the drug to cure multiple sclerosis and diabetic skin ulcers. (*Id.* at ¶ 54.) Plaintiffs were also told: Nurovysn would be listed in the NASDAQ shortly after its public offering for $15.50 per share, an Osmond family member invested millions in the start-up company, SF-1019 would be given "orphan status" leading to an expedited FDA approval, and Immunosyn would obtain approval for the sale of SF-1019 in the United States within a two-week time frame. (*Id.* at ¶¶ 58-61, 73.)

Based on these representations, Plaintiffs were induced to enter into what the parties have called the First Argyll Contracts. (*Id.* at ¶ 65.) Under these contracts, executed in March and April 2006, Plaintiff Albergo paid $1,000,000 and Plaintiff Irwin paid $25,000 in exchange for 100,000 and 2,500 free-trading shares of common stock in Immunosyn, respectively. (*Id.* at ¶¶ 68, 72.) Neither Plaintiff received the stock. (*Id.* at ¶ 128, 137.) In March 2007, Plaintiffs were told that SF-1019 was already approved for sale in Canada, garnering $26,000,000 in monthly orders. (*Id.* at ¶ 78.) Then, on May 7, 2007, Plaintiffs received a letter from Defendant Miceli requiring them to sign new contracts, the Second Argyll Contracts, in order to receive their original stock certificates. (*Id.* at ¶ 79.) The Second Argyll Contracts contained terms and conditions not present in the First Contracts. (*Id.* at ¶ 80.) For example, the shares of stock being purchased by Plaintiffs were now restricted. (*Id.*) There were also references to SEC filings that were inconsistent with representations in the First Argyll Contracts. (*Id.*) However, because of the alleged false representations of Defendants, and given the requirement that Plaintiffs sign the Second Argyll Contracts in order to receive the original stock they purchased, both Plaintiffs signed the Second Argyll Contracts. (*Id.* at ¶ 81.) To this date, Defendants

continue to assert Immunosyn's potential strength in the market, although the company reported no revenue in 2007 or 2008 in its 10-Q and is currently selling stock at less than $1.00 per share. (*Id*. at ¶¶ 77, 92, 109.)

After signing the Second Argyll Contracts, Plaintiffs discovered Defendants had been selling SF-1019 through various commercial channels in violation of the exclusive license, and that Defendants had failed to report and allocate income to Immunosyn to the detriment of its stockholders. (*Id*. at ¶ 94.) Plaintiffs also allege that since 2006, over $1,000,000 was fraudulently transferred from Argyll Equities to Defendants Dona Miceli and the Thomas Road Company. (*Id*. at ¶¶ 164, 168.)

Plaintiffs allege Defendants' schemes were devised years ago. (*See id*. at ¶ 143.) Defendants Miceli, McClain, Sr. and McClain, Jr. purportedly entered into a 15-year partnership agreement on or about January 15, 1999. (*Id*. at ¶ 19.) On August 26, 1999, Defendant James Miceli was convicted of felony money laundering, forgery, perjury and theft over $100,000 in the State of Illinois. (*Id*. at ¶ 20.) In addition, Defendant McClain, Sr. was involved with a company called Nextpath Technologies, through which he sold large volumes of what was promised to be unrestricted stock to several unsuspecting investors. (*Id*. at ¶¶ 22, 26.) Instead, the investors received restricted stock after much delay, sued Defendant McClain, Sr. based on his misleading information, and obtained judgment against him for approximately $4,500,000. (*Id*. at ¶¶ 26, 27.)

Plaintiffs filed this lawsuit against five individual defendants: James Miceli, CEO of Argyll Biotech/Argyll Equities, Dona Miceli, wife of James Miceli, Douglas McClain, Sr., "controlling person" of Argyll Biotech/Argyll Equities and "Chief Science Officer" of Argyll Biotech, Douglas McClain, Jr., President of Argyll Biotech/Argyll Equities and CFO of Immunosyn, and Stephen Ferrone, President of Immunosyn, as well as the four corporations involved: Argyll Equities, LLC, Argyll Biotechnologies, LLC, Immunosyn Corp., and the Thomas Road Company. Plaintiffs have asserted eight claims for relief: (1) breach of contract, (2) violation of the Securities Exchange Act, (3) fraud and fraud in the inducement, (4) violation of RICO, (5) conspiracy to violate RICO, (6) civil conspiracy, (7) unjust enrichment, and (8) fraudulent conveyance.

/ / /

/ / /

## II.

## DISCUSSION

**A.  Motion to Dismiss**

   *1.  Legal Standard*

In two recent opinions, the Supreme Court established a more stringent standard of review for 12(b)(6) motions. *See Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). To survive a motion to dismiss under this new standard, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Iqbal*, 129 S.Ct. at 1949 (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950 (citing *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007)). The reviewing court must therefore "identify the allegations in the complaint that are not entitled to the assumption of truth" and evaluate "the factual allegations in [the] complaint to determine if they plausibly suggest an entitlement to relief." *Id.* at 1951.

   *2.  Securities Fraud, Fraud and Fraud in the Inducement*

Defendants argue Plaintiffs' first cause of action for securities fraud and second cause of action for fraud and fraud in the inducement do not meet the heightened pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). (Def.'s Mot. to Dismiss 10:12-14.) Each is addressed in turn.

   a.  <u>Fraud and Fraud in the Inducement</u>

The elements of a fraud claim are false representation, knowledge of falsity, intent to defraud, justifiable reliance, and damages. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003). Under Rule 9(b), "A party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). A plaintiff must set forth the time, place and content of the false representation and explain why it is false. *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (superseded

by statute on other grounds). In other words, fraud allegations must be accompanied by "the who, what, when, where, and how" of the misconduct charged. *Vess*, 317 F.3d at 1106. The "alleged fraud must be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Id.* However, Rule 9(b) "may be relaxed as to matters within the opposing party's knowledge ... [and] the particularity requirement may be satisfied if the allegations are accompanied by a statement of the facts on which the belief is founded." *Moore v. Kayport Package Express*, 885 F.2d 531, 540 (9th Cir. 1989).

Here, Plaintiffs allege they relied on a series of misrepresentations before entering in to both the First and Second Argyll Contracts. In early 2006, Plaintiff Albergo engaged in conversations and writings with Defendants Miceli and McClain, Sr. Defendants made multiple misrepresentations, including that Immunosyn had an exclusive right to sell SF-1019, SF-1019 had the ability to cure multiple sclerosis and diabetic skin ulcers, there were studies to conclusively prove the effectiveness of SF-1019 and an Osmond family member invested millions of dollars in Immunosyn. (FAC ¶¶ 52-61.) Similarly, Plaintiff Irwin alleges that in early 2006, Dr. Jochen Brenner represented to him that he was selling Immunosyn stock, that Immunosyn was the "sole licensee" of a new "wonder drug," that Immunosyn had exclusive rights to make and sell SF-1019, that the drug cured severe cases of diabetes, that Immunosyn would obtain approval for the sale of SF-1019 in the United States within two weeks and that the stock would go public at that time for $15.50 per share. (*Id*. at ¶¶ 71-73.) Both Plaintiffs allege they were fraudulently induced into signing the Second Argyll Contracts because on March 26, 2007, Dr. Brenner represented that SF-1019 was approved for sale in Canada and that orders had been received for 130,000 vials per month–totaling $26,000,000 every month. (*Id*. at ¶ 78.) Further, on May 7, 2007, Defendant Miceli sent both Plaintiffs a letter with enclosed copies of the promised stock certificates, requiring Plaintiffs to sign the Second Argyll Contracts to receive their original stock certificates. (*Id*. at ¶ 79.) Plaintiffs argue Defendants pulled a "bait and switch" because the Second Argyll Contracts now referred to the shares of stock, which were already paid for, as "restricted" stock. (*Id*. at ¶ 80.)

Defendants argue the claim fails because Plaintiffs failed to include detailed allegations describing what was represented about Immunosyn, when the information was provided, why that

information was false, and the appropriate level of scienter. Defendants also argue that Dr. Brenner is not alleged to be an agent of Defendants, and that any agency claim fails because it was not until after this litigation began that Plaintiffs discovered Dr. Brenner was an employee of Argyll Equities.

Although Plaintiffs do not provide exact dates for each of the misrepresentations, the allegations are sufficient to satisfy Rule 9(b). The misrepresentations took place during a discrete time frame, early 2006 through the dates on which Plaintiffs signed the contracts, May and April 2006. *See Continental Airlines, Inc. v. Mundo Travel Corp.*, 412 F.Supp.2d 1059, 1068-69 (E.D. Cal. 2006) (stating allegations that misrepresentations were made "between March and May 2005" satisfied Rule 9(b)). Plaintiffs allege who made the statements and they provide the context of each statement. Plaintiffs allege the statements were false and that they relied on the statements when entering into the contracts. Plaintiffs further allege that Defendants Miceli and McClain, Sr. have used Dr. Brenner as an agent to help sell Immunosyn stock. (*Id.* at ¶ 74.) Plaintiffs allege that Dr. Brenner told Irwin he was selling stock on behalf of Argyll Equities, and that the information he was providing to Irwin came from Defendants Miceli and McClain, Sr. (*Id.* at 75.) Plaintiffs' agency claim is further supported by the fact that Plaintiff Albergo transferred $400,000 to Brenner for the purchase of $40,000 shares of stock. The fact that Plaintiffs later discovered Brenner was an employee of Argyll Equities does not indicate that Plaintiffs had no reason to believe he was acting as an agent at the time they entered into the contracts. Accordingly, Defendants' motion to dismiss the fraud and fraudulent inducement claim is denied.

b.      Securities Fraud

Securities fraud claims must meet the heightened pleading standards of Rule 9(b), as well as those of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). The PSLRA requires Plaintiffs claiming securities fraud to submit with particularity the facts constituting the alleged violation, as well as the facts demonstrating Defendants' intent to deceive or manipulate**.** *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). The facts must give rise to a strong inference that Defendants acted with the required state of mind. *Id*. at 314. "It does not suffice that a reasonable fact finder plausibly could infer from the complaint's allegations the requisite state of mind." *Id*. Instead, a "strong" inference of scienter must be "cogent and at least as compelling as any

opposing inference of non-fraudulent intent." *Id*.

Plaintiffs allege Defendants violated the Exchange Act by: (1) failing to report income generated from the sale of SF-1019, (2) claiming in SEC filings made January 3, 2007 that Immunosyn had the exclusive worldwide license to market, distribute and sell SF-1019, and (3) failing to disclose that SF-1019 was being sold through channels outside of Immunosyn. (FAC ¶ 97.) In detailing their allegations, Plaintiffs have stated that Immunosyn's 10-Q, dated May 15, 2008, states it has no revenue and limited operations, when in fact SF-1019 has been sold for profit in the United States during 2008 without the profits being allocated to Immunosyn. (*Id.* at ¶¶ 92, 94, 107.) Thus, Plaintiffs claim the SEC filings are false or misleading because they do not account for the sales outside of Immunosyn's exclusive license. Taking Plaintiffs' allegations as true, Plaintiffs have successfully argued there is a strong inference of scienter on the part of Defendants. Further, Plaintiffs have alleged the date of the SEC filings, the date of the 10-Q, who signed the 10-Q, approximate dates of sales of SF-1019 outside of Immunosyn's exclusive license, and who knowingly took part in these sales and where. Defendants' motion to dismiss the securities fraud claim is therefore denied.

### 3. Breach of Contract

The elements of a breach of contract claim are: (1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages. *CDF Firefighters v. Maldonado*, 158 Cal. App. 4th 1226, 1239 (2008). Defendants argue Plaintiffs fail to allege facts that constitute a breach of contract. Plaintiffs, however, have alleged there existed a set of express contracts entitled the First Argyll Contracts, that they paid a combined sum of $1,025,000 for unrestricted stock, did not receive any such stock within the agreed time frame, and were damaged in the amount they paid.

Nonetheless, Defendants contend the claim fails because the Second Argyll Contracts superseded the First Argyll Contracts. Plaintiffs, however, allege the Second Argyll Contracts were procured by fraud. Fraudulent inducement renders an entire contract voidable, even if the contract provides that all conditions and representations therein supersede all prior agreements and representations. *Tain v. Hennessey*, 2009 U.S. Dist. Lexis 111654 at *13 (S.D. Cal. 2009) (quoting *Hinesley v. Oakshade Town Center*, 135 Cal. App. 4th 289, 301). Thus, Plaintiffs have adequately

pled breach of the First Argyll Contracts.[1]

To the extent Plaintiffs allege breach of Defendants' oral contracts, however, the claim fails. Plaintiffs do not adequately allege the terms of the oral contracts or the parties to such contracts. The statements forming the alleged oral contracts appear to be the same statements used to induce Plaintiffs to sign the First Argyll Contracts, rather than statements indicating an independent oral contract. Accordingly, Plaintiffs' breach of contract claim is dismissed without prejudice as to any alleged oral contracts.

    4.    *RICO, Conspiracy to Violate RICO, and Civil Conspiracy*

Title 18 U.S.C. § 1962(a)-(d), makes it unlawful to conduct or conspire to conduct an enterprise whose activities affect interstate commerce by committing or agreeing to commit a pattern of racketeering activity, including mail fraud, securities fraud, and any other offense punishable under state criminal or federal laws. *See Sedima v. Imrex Co.*, 473 U.S. 479, 481-84 (1985). A pattern of racketeering activity requires a showing "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H. J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989). Here, Defendants argue the RICO and conspiracy to violate RICO claims fail because Plaintiffs have not alleged a threat of continued criminal activity. Continuity refers "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241. "Whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case. *Id.* at 242. Continuity may be shown where the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Id*.

Plaintiffs have demonstrated a threat of continued criminal activity. Plaintiffs allege Defendants Miceli, McClain, Sr. and McClain, Jr. began a partnership in 1999 and since then have engaged in unlawful behavior. Plaintiffs allege McClain Sr. had a judgment entered against him for

---

[1] Defendants also argue Plaintiffs' breach of contract claim must be dismissed because Plaintiffs have not attached the contracts to the complaint. "Failure to attach [a] contract to the complaint does not render [Plaintiffs'] claim invalid because Rule 8 requires merely a short and plain statement of the claim showing that the pleader is entitled to relief." *Vincent Consol. Commodities, Inc. v. Am. Trading & Transfer, LLC*, 2007 U.S. Dist. Lexis 53680 at *9 (S.D. Cal. 2007) (quotations omitted). Further, Plaintiffs submitted the contracts with their motion for writ of attachment and Defendants have asked the Court to judicially notice the contracts; thus, the contracts are before the Court.

conduct similar to that alleged here, *i.e.*, promising unrestricted stock in a company but then providing buyers with restricted stock. (FAC ¶¶ 26-27.) Plaintiffs allege that Defendant McClain, Sr. then used the money obtained from his prior fraudulent practices to finance the start of other companies, namely, Argyll Equities, which, in turn, financed the start of Immunosyn. (*Id.* at ¶¶ 29, 35.) Plaintiffs also allege that there are numerous unsatisfied judgments against Argyll Equities and Defendant McClain, Sr. regarding securities and stock lending fraud. (*Id.* at ¶ 33.)  Plaintiffs further allege that Defendants' misrepresentations regarding SF-1019 continue to this day. (*See id.* at ¶¶ 89-91.) Plaintiffs, therefore, have adequately alleged a threat of continued criminal activity.

Similarly unavailing is Defendants' claim that Plaintiffs have merely plead that Defendants were involved in setting up a legal drug company and that Plaintiffs knew they were investing in a speculative company.  While an element of risk is present in every stock investment, Defendants here are alleged to have knowingly hidden the risks in purchasing stock in Immunosyn, and instead have presented Plaintiffs with fictitious statistics and statements regarding the value of Immunosyn. Accordingly, Defendants' motion to dismiss the RICO and Conspiracy claims is denied.

   5.   *Unjust Enrichment*

Plaintiffs assert a claim for unjust enrichment.  Unjust enrichment, however, is a "general principle underlying various legal doctrines and remedies;" it is not an independent cause of action. *McBride v. Boughten*, 123 Cal. App. 4th 379, 387 (2004) (quoting *Melchior v. New Line Products, Inc.*, 106 Cal. App. 4th 779, 793 (2003)). Accordingly, Plaintiff's claim for unjust enrichment fails.

   6.   *Fraudulent Transfer*

Plaintiffs bring their fraudulent transfer claim under the California Uniform Fraudulent Transfer Act ("UFTA"). "A fraudulent conveyance under UFTA involves a transfer by the debtor of property to a third person undertaken with the intent to prevent a creditor from reaching that interest to satisfy its claim." *Filip v. Bucurenciu*, 129 Cal. App. 4th 825, 829 (2005) (quotations omitted). Defendants argue the UFTA claim fails because Plaintiffs are not creditors and were not creditors at the time of the alleged fraudulent conveyance. However, a person with a "claim" is a creditor under UFTA. Civil Code Section 3439.01 (c). Further, "A transfer made ... by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made

the transfer ... with actual intent to hinder, delay, or defraud any creditor of the debtor." *Id*. (quotations omitted).

Defendants also argue that Plaintiffs fail to plead that any improper transfers were made with the actual intent to hinder, delay or defraud any creditor of the debtor. Plaintiffs, however, allege that "Argyll Equities is insolvent due to substantial judgments being obtained against it by creditors," and that "assets of Argyll Equities have been transferred to Dona Miceli without providing reasonably equivalent value in exchange to Argyll Equities and with the intent to hinder and prevent collection by Plaintiffs and other creditors." (FAC ¶¶ 165, 169.) Plaintiffs then claim they have been damaged by the fraudulent transfer of money from Argyll Equities to Dona Miceli. (*Id*. at ¶ 170.) Thus, Plaintiffs have adequately pled a fraudulent transfer claim against Defendant Dona Miceli. On the other hand, Plaintiffs have not claimed the transfer of money from Argyll Equities to Defendant Thomas Road Company was done with the actual intent to hinder, delay or defraud any creditor of the debtor. Accordingly, the motion to dismiss the fraudulent transfer claim is granted as to Defendant Thomas Road Company and denied as to Defendant Dona Miceli.

7. *Alter Ego Liability*

Defendants argue that Plaintiffs fail to allege sufficient facts to pierce the corporate veil and that Plaintiffs have simply made conclusory allegations that the Defendant companies are alter egos of the individual Defendants. (*Id*. at 17:3-5.) "Under the alter ego doctrine, however, where a corporation is used by an individual or individuals ... to perpetrate fraud ... or accomplish some other wrongful or inequitable purpose, a court may disregard the corporate entity and treat the corporation's acts as if they were done by the persons actually controlling the corporation." *Communist Party v. 522 Valencia, Inc.*, 35 Cal. App. 4th 980, 993 (1995). Generally, there are two requirements for applying the alter ego doctrine "(1) there is such a unity of interest and ownership between the corporation and the individual or organization controlling it that their separate personalities no longer exist, and (2) failure to disregard the corporate entity would sanction a fraud or promote injustice." *Id.*

Some factors supporting a unity of interest are inadequate capitalization, failure to issue stock, an individual's treatment of corporate assets as his own, disregard of legal formalities, and a diversion of assets from the corporation by or to a stockholder or other person or entity. *Assoc. Vendors, Inc.*

*V. Oakland Meat Co.*, 210 Cal. App. 2d 825, 838 (1962).  The prospect of an inequitable result is evident when there exists an unsatisfied creditor coupled with an abuse of the corporate form, such as undercapitalization so extreme that the capital generated is insufficient to meet obligations that could reasonably arise in the standard course of business.  *See Orloff v. Allman*, 819 F.2d 904, 909 (9th Cir. 1987).

As stated earlier, Plaintiffs have adequately alleged Defendants used their corporations to perpetrate securities fraud and fraudulent inducement against Plaintiffs.  In addition, Plaintiffs have alleged that Defendants Miceli, McClain, Sr. and McClain, Jr. control Argyll Equities, Argyll Biotech and Immunsoyn, that they have failed to follow corporate formalities, and that they do not segregate their personal assets from business assets.  (*Id.* at ¶¶ 47, 49.)  Accordingly, Plaintiffs have adequately pled sufficient facts to show a unity of interest between the Defendant corporations and the individual Defendants.  Defendants' motion to dismiss on these grounds is denied.

### B.    Motion for Writ of Attachment

#### 1.    Legal Standard

Motions for writ of attachment are subject to the laws of the state where the district court is located; federal statutes govern to the extent they apply.  Fed. R. Civ. P. 64(a) & (b).  Thus, California law generally provides the rules governing Plaintiffs' motion.  The function of an attachment is to secure the payment of any judgment rendered in the main action.  To secure a writ of attachment, the Plaintiffs have the burden to prove: (1) the claim is one on which an attachment may be issued; (2) the probable validity of such claim; (3) the attachment is not sought for any other purpose than to secure recovery on the claim and; (4) the amount to be secured by the attachment is greater than zero.  Cal. Civ. Proc. Code § 484.090.  Because granting the motion would cause Defendants to lose control of their property, the prerequisites for issuance of a writ of attachment are strictly construed against Plaintiffs.  *Blastrac v. Concrete Solutions & Supply*, 678 F. Supp. 2d 1001, 1004 (C.D. Cal. 2010).

An attachment may be issued only if the claim sued upon is (a) "a claim for money based upon a contract, express or implied; (b) of a fixed or readily ascertainable amount not less than $500 (by reference to the contract itself); (c) that is either unsecured or secured by personal property, not real property (including fixtures); and (d) is a commercial claim." Cal. Civ. Proc. Code § 483.010.

Attachment is available with respect to any claim against a partnership or corporation, or to claims against individuals that "arise out of the conduct by the individual of a trade, business or profession." Cal. Civ. Proc. Code § 483.010(c).

Probable validity exists where it is "more likely than not that the plaintiff will obtain a judgment against the defendant on that claim." Cal. Civ. Proc. Code § 481.190. In other words, "the Court must consider the relative merits of the positions of the respective parties and make a determination of the probable outcome of the litigation." *Loeb & Loeb v. Beverly Glen Music, Inc.*, 166 Cal. App. 3d 1110, 1120 (1985).

Declarations stating that the attachment is sought for an appropriate purpose and the amount to be secured is greater than zero must contain competent evidence by a declarant with personal knowledge of each fact stated, while conclusory or more generalized statements do not suffice.[2] The Code requires the facts stated in each affidavit "be set forth with particularity." Cal. Civ. Proc. Code § 482.040. In addition, facts in support of a motion for writ of attachment must be evidentiary, and not the alleged ultimate facts normally set forth in pleadings.

    *2.    Type of Claim*

Plaintiffs have shown their claims to be appropriate for filing a motion for writ of attachment. The proposed writ is based primarily on the breach of the First Argyll Contracts and fraudulent inducement to enter into both the First and Second Argyll Contracts.[3] Plaintiffs attribute the formation of the written contract and its eventual breach to the underlying fraudulent conduct. "An action to avoid or rescind an agreement because of fraudulent inducement . . . is an action on a contract." *In re Baroff*, 105 F.3d 439, 443 (9th Cir. 1997). Therefore, both claims are based on an express contract, as required. In addition, the claims for money are appropriate because they are of an ascertainable amount ($1,025,000) and are commercial claims. Finally, the allegations arise out of conduct by

---

[2] Defendants object to the admissibility of Plaintiffs' declarations in this case because they were signed with electronic, rather than original, signatures. Use of the electronic signature was an inadvertent mistake of counsel, and Plaintiffs re-filed identical declarations with original signatures. Defendants' objection is overruled.

[3] Plaintiffs also seek attachment under the Uniform Fraudulent Transfer Act, Cal. Civ. Code § 3439 et seq., on the claim that Argyll Equities fraudulently transferred over $1 million to Dona Miceli. Plaintiffs have failed to meet their burden on this claim as there are inconsistencies in the record as to whether Mrs. Miceli ever loaned money to Argyll Equities. (*See* Ex. V, Wirtz Depo. 84:11-13, 85:10-15.)

individuals of a trade or business, namely, the sale of common stock.

    3.    *Probable Validity*

The most hotly debated issue is whether or not the claims have "probable validity" according to California's Code of Civil Procedure. In other words, the Court must determine if it is more likely than not that judgments on the two claims will be awarded in favor of Plaintiffs.

To show probable validity on their breach of contract claim, Plaintiffs must establish by a preponderance of the evidence "the existence of the contract, performance by the plaintiff or excuse for nonperformance, breach by the defendant, and damages." *First Commercial Mortgage Co. v. Reece*, 89 Cal. App. 4th 731, 745 (2001). Plaintiffs have submitted undisputed facts in their briefs and declarations that there existed a set of express contracts referred to as the First Argyll Contracts, that they paid a combined sum of $1,025,000 for unrestricted stock, and that they did not receive any such stock. Plaintiffs then contend they suffered damages in the amount paid under the contracts, due to Defendants' failure to timely deliver the unrestricted stock certificates. Thus, Plaintiffs have met their burden to show probable validity of their claim.

Defendants argue that Miceli is not personally liable for the breach of contract because he is not a party to the contract. Corporate officers, however, are personally liable for their own torts. *PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368, 1380 (2000). As discussed above, Plaintiffs have adequately alleged that Miceli fraudulently induced Plaintiffs into signing the contracts. This is supported by Plaintiffs' declarations and other evidence. The evidence shows, for example, that Defendants Miceli and McClain, Sr. controlled "The Argyll Group," a group of companies that owned the rights to a drug called SF-1019 (Irwin Decl. ¶ 4; Exh. F); prior to March 13, 2006, Plaintiffs were told about a "wonder drug" called SF-1019, which was being promoted by Defendants Miceli and McClain, Sr., through their agent Dr. Jochen Brenner (Irwin Decl. ¶ 4; Albergo Decl. ¶ 4); Defendants Miceli and McClain, Sr. represented to Plaintiff Albergo that SF-1019 cured multiple sclerosis and diabetic skin ulcers, confidential studies existed to conclusively prove the effectiveness of SF-1019, an Osmond family member invested millions in the new company, and Plaintiff Albergo would be receiving "free-trading" shares of the company's common stock (Albergo Decl. ¶ 8); despite repeated inquiries, Plaintiff Albergo has not seen the purported published studies showing SF-1019's

effectiveness, and Immunosyn's SEC filings indicate the drug has never been tested (Albergo Decl. ¶ 19; Exh. CC); relying on such misrepresentations, Plaintiffs were induced to sign the First and Second Argyll Contracts (Irwin Decl. ¶¶ 10, 14; Albergo Decl. ¶¶ 9, 12, 14); and neither Plaintiff received the unrestricted stock pursuant to the First Argyll Contracts (Irwin Decl. ¶ 13; Albergo Decl. ¶ 10.).

Moreover, Miceli is personally liable for the breach of contract under the alter ego doctrine. As previously discussed, "where a corporation is used by an individual or individuals ... to perpetrate fraud ... or accomplish some other wrongful or inequitable purpose, a court may disregard the corporate entity and treat the corporation's acts as if they were done by the persons actually controlling the corporation." *Communist Party v. 522 Valencia, Inc.*, 35. Cal. App. 4th 980, 993 (1995). Plaintiffs have shown Miceli used the corporate form to perpetrate fraud, namely by fraudulently inducing Plaintiffs into investing more than $1 million in Immunosyn. Additionally, SF-1019 has been sold outside the exclusive license without the income being allocated to Immunosyn (Albergo Decl. ¶ 17), and SEC filings from 2008 show that Immunosyn has no operating history and has generated no revenue to date (Exh. CC), indicating diversion of funds and inadequate capitalization of Immunosyn. Accordingly, Plaintiffs have shown probable validity of their claims.

   *4.*  *Remaining Elements*

Plaintiffs have asserted in their declarations that they are seeking the attachment only to secure payment on their respective judgments. (Irwin Decl. ¶ 19; Albergo Decl. ¶ 30.) Plaintiff Albergo seeks an attachment in the amount of $600,000, while Plaintiff Irwin seeks the attachment in the amount of $25,000. (Pls.' Mem. 2:12-14.) Plaintiffs have shown that the attachment is not sought for any purpose other than to secure recovery on the claim and that the amount to be secured by the attachment is greater than zero.

All elements required for a writ of attachment have been met. Accordingly, Plaintiffs' motion is granted.[4]

/ / /

/ / /

---

[4] To the extent Defendants claim a homestead exemption, the amount of such exemption can be determined if and when Plaintiffs obtain judgment.

## III.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is granted in part and denied in part. Specifically, the Court grants Defendants' motion as to the alleged breach of oral contract, the unjust enrichment claim, and the fraudulent transfer claim against Defendant Thomas Road Company. The remainder of Defendants' motion is denied. Plaintiffs may file a Second Amended Complaint in accordance with this Order by no later than September 7, 2010.

Plaintiffs' motion for writ of attachment is granted. Thus, Plaintiffs have a right to attach property of Defendant James T. Miceli in the amount of $625,000. The clerk shall issue a writ of attachment in the amount of $625,000 upon the filing of an undertaking in the amount of $10,000, for the real property commonly known as 1440 Cypress Point, Poway, CA, San Diego County APN 277-210-07, and legally described in the attached Legal Description Exhibit.

**IT IS SO ORDERED.**

DATED: August 23, 2010

_____
HON. DANA M. SABRAW
United States District Judge