Andrew J. Tine, MASBN 633639 *(Pro Hac Vice)*
**LAW OFFICES OF ANDREW J. TINE**
251 Thames Street, 2nd Floor
Bristol, RI 02809
Tel: 401.396.9002
Fax: 401.396.9479
Email: atine@tinelaw.com

# JANIS LAW GROUP
### A PROFESSIONAL CORPORATION
Dean T. Janis (CSB 144791)
550 West C Street, Suite 2000
San Diego, CA 92101
Telephone:  619.814.3525
Facsimile:  619.955.5318
Email: dean.janis@janislaw.net

Attorneys for Plaintiffs
Robert Albergo and David Irwin

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT ALBERGO,  an individual, and DAVID IRWIN, an individual,<br><br>        Plaintiffs,<br><br>    v.<br><br>IMMUNOSYN CORPORATION, a Delaware corporation, ARGYLL BIOTECHNOLOGIES, LLC, a Texas limited liability company, JAMES T. MICELI, an individual, DOUGLAS A. MCCLAIN, JR., an individual, ARGYLL EQUITIES, LLC, a Texas limited liability company, STEPHEN FERRONE, an individual, DOUGLAS A. MCCLAIN, SR., an individual, THOMAS ROAD COMPANY, and DONA MICELI, an individual,<br><br>        Defendants. | CASE NO.  __09cv2653 DMS AJB __<br><br>**SECOND AMENDED COMPLAINT FOR:**<br>1)  **VIOLATION OF SECURITIES EXCHANGE ACT;**<br>2)  **FRAUD AND FRAUD IN THE INDUCEMENT;**<br>3)  **BREACH OF CONTRACT;**<br>4)  **VIOLATION OF RICO;**<br>5)  **CONSPIRACY TO VIOLATE RICO;**<br>6)  **CIVIL CONSPIRACY;**<br>7)  **UNJUST ENRICHMENT; AND**<br>8)  **FRAUDULENT CONVEYANCE** |

SECOND AMENDED COMPLAINT

1    Now come plaintiffs ROBERT ALBERGO and DAVID IRWIN (collectively,

2  "PLAINTIFFS") and for their second amended complaint against IMMUNOSYN

3  CORPORATION, ARGYLL  BIOTECHNOLOGIES, LLC, JAMES T. MICELI, DOUGLAS A.

4  MCCLAIN, JR., ARGYLL EQUITIES, LLC, STEPHEN FERRONE, DOUGLAS A.

5  MCCLAIN, SR., THOMAS ROAD COMPANY, and DONA MICELI (collectively,

6  "DEFENDANTS") state as follows:

7                                  **Parties**

8       1.       Plaintiff, Dr. Robert Albergo ("ALBERGO"), is a resident of Florida.

9       2.       Plaintiff, David Irwin ("IRWIN"), is a resident of Florida.

10      3.       Defendant, Immunosyn Corporation ("IMMUNOSYN"), is a Delaware

11  corporation with its principal place of business at 10815 Rancho Bernado Road, Suite 101, San

12  Diego, California.

13      4.       Defendant, Argyll Biotechnologies, LLC ("ARGYLL BIOTECH"), is a Texas

14  limited liability company with its principal place of business at 10815 Rancho Bernado Road,

15  Suite 101, San Diego, California.

16      5.       Defendant, Argyll Equities, LLC ("ARGYLL EQUITIES"), is a Texas limited

17  liability company, with its principal place of business at 10815 Rancho Bernardo Road, Suite

18  101, San Diego, California.

19      6.       Defendant, James T. Miceli ("MICELI"), is a resident of California.  MICELI is

20  the Chief Executive Officer of ARGYLL BIOTECH and ARGYLL EQUITIES.

21      7.       Defendant, Douglas A. McClain, Jr. ("MCCLAIN, JR."), is a resident of Georgia.

22  MCCLAIN is the President of ARGYLL BIOTECH and ARGYLL EQUITIES and the Chief

23  Financial Officer of IMMUNOSYN.

24      8.       Defendant, Stephen Ferrone ("FERRONE"), is a resident of Illinois and/or

25  California.  FERRONE is the President of IMMUNOSYN.

26      9.       Defendant, Douglas A. McClain, Sr. ("MCCLAIN SR.") is a resident of Texas.

27  MCCLAIN SR. is an owner and/or controlling person with respect to ARGYLL EQUITIES

28

Janis Law Group,
APC        SECOND AMENDED COMPLAINT

1 and/or ARGYLL BIOTECH and holds himself out to be ARGYLL BIOTECH's Chief Science

2 Officer.

3     10.    Defendant, Thomas Road Company ("THOMAS ROAD CO."), is a shell

4 company, wholly owned and controlled by James T. Miceli.

5     11.    Defendant, Dona Miceli ("DONA MICELI), is a resident of California and the

6 wife of James T. Miceli.

7 **Jurisdiction and Venue**

8     12.    This action is brought personally by PLAINTIFFS pursuant to the Securities

9 Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78m, 78r and 78t and RICO statute 18

10 U.S.C. § 1964 *et seq.* Jurisdiction of this court and venue in this district are proper pursuant to

11 15 U.S.C. § 78aa and 18 U.S.C. § 1964 *et seq.* Further, jurisdiction is conferred under 15 U.S.C.

12 § 1332(a)(1) because PLAINTIFFS and DEFENDANTS are citizens of different states and the

13 amount in controversy exceeds $75,000 in damages.

14 **Governing Law**

15     13.    Pursuant to 15 U.S.C. § 78m, IMMUNYSON and its principals are required to

16 maintain public filings and books and records for the benefit of investors that accurately and

17 fairly reflect the transactions and dispositions of the assets of the issuer and maintain financial

18 records that conform with generally accepted accounting principles.

19     14.    Pursuant to 15 U.S.C. § 78r (a), "Any person who shall make or cause to be made

20 any statement in any application, report, or document filed pursuant to this chapter or any rule or

21 regulation thereunder or any undertaking contained in a registration statement as provided in

22 subsection (d) of section 78o of this title, which statement was at the time and in the light of the

23 circumstances under which it was made false or misleading with respect to any material fact,

24 shall be liable to any person (not knowing that such statement was false or misleading) who, in

25 reliance upon such statement, shall have purchased or sold a security at a price which was

26 affected by such statement, for damages caused by such reliance, unless the person sued shall

27 prove that he acted in good faith and had no knowledge that such statement was false or

28

SECOND AMENDED COMPLAINT

1  misleading. A person seeking to enforce such liability may sue at law or in equity in any court of

2  competent jurisdiction. In any such suit the court may, in its discretion, require an undertaking

3  for the payment of the costs of such suit, and assess reasonable costs, including reasonable

4  attorneys' fees, against either party litigant."

5       15.    Pursuant to 15 U.S.C. § 78t (a) and (b), "Every person who, directly or indirectly,

6  controls any person liable under any provision of this chapter or of any rule or regulation

7  thereunder shall also be liable jointly and severally with and to the same extent as such

8  controlled person to any person to whom such controlled person is liable, unless the controlling

9  person acted in good faith and did not directly or indirectly induce the act or acts constituting the

10  violation or cause of action."  "It shall be unlawful for any person, directly or indirectly, to do

11  any act or thing which it would be unlawful for such person to do under the provisions of this

12  chapter or any rule or regulation thereunder through or by means of any other person."

13       16.    Pursuant to 17 C.F.R. § 240.10b-5, "It shall be unlawful for any person, directly

14  or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails

15  or of any facility of any national securities exchange, (a) To employ any device, scheme, or

16  artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a

17  material fact necessary in order to make the statements made, in the light of the circumstances

18  under which they were made, not misleading, or (c) To engage in any act, practice, or course of

19  business which operates or would operate as a fraud or deceit upon any person, in connection

20  with the purchase or sale of any security.

21       17.    Pursuant to 18 U.S.C. § 1964 (c) Any person injured in his business or property

22  by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate

23  United States district court and shall recover threefold the damages he sustains and the cost of

24  the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct

25  that would have been actionable as fraud in the purchase or sale of securities to establish a

26  violation of section 1962.

27

28

18.     Pursuant to 18 U.S.C. § 1962 **(a)** It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.  Pursuant to 18 U.S.C. § 1962 **(c)** It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.  Racketeering is defined by Section 1961 and includes mail fraud.

### Background of the Defendants and Corporate Entities

19.     On or about 1993, MCCLAIN, SR. was involved in a security/bond fraud scheme, wherein his fraud, along with numerous other defendants, resulted in defrauding an entity known as the Cleft of the Rock Foundation for more than $3,900,000.  Judgment ultimately entered in favor of the Cleft of the Rock Foundation against MCCLAIN, SR. for $5,000,000.

20.     On or about January 15, 1999, MICELI, MCCLAIN, SR. and MCCLAIN, JR. entered into a written partnership agreement, "for the purpose of devising, creating, designing, pursuing, formulating, enacting and engaging in all companies, corporations, partnerships or legal entities which are or have been or will be used by the parties for the purpose of creating any income or tangible item recognized as having value foreign or domestic" with a term of "fifteen years." (hereinafter the "Partnership Agreement").

21.     On or about August 26, 1999, MICELI was convicted of felony money laundering, forgery, perjury and theft over $100,000 in the State of Illinois.

22.     MCCLAIN, SR., MCCLAIN and MICELI worked together at International Profit Associates ("IPA") in Illinois.

23.     Through IPA, MCCLAIN SR. became involved with a public entity known as

5

1  Nextpath Technologies.  MCCLAIN SR. was able to obtain and sell a large volume of shares of

2  Nextpath Technologies to unsuspecting investors, based on false information concerning the

3  company, for approximately $6,000,000.

4     24.  MCCLAIN SR. received funds and/or distributed Nextpath Technologies stock

5  certificates through the US mail or other carriers interstate to unsuspecting investors.

6     25.  MCCLAIN SR. communicated with prospective investors over the telephone

7  interstate, to convince and deceive them into purchasing Nextpath Technologies stock.

8     26.  Salvatore and Frank Bramante (hereinafter the "Bramanates") were investors

9  duped by MCCLAIN SR. to buy Nextpath Technologies stock based upon false and misleading

10  information.

11     27.  The Bramantes were promised unrestricted stock in Nextpath Technologies, a

12  public company, but after much delay, were provided with restricted stock by MCCLAIN, SR.

13     28.  The Bramantes sued MCCLAIN, SR. in United States District Court for the

14  District of Massachusetts and obtained judgment against him during 2006 for about $4,500,000.

15     29.  After MCCLAIN, SR.'s involvement with Nextpath Technologies, MCCLAIN,

16  SR., MCCLAIN, JR. and MICELI left IPA and worked together in an entity called FIT

17  Management.

18     30.  Money from the sale of Nexthpath Technologies stock was used to finance the

19  start of FIT Management.  FIT Management financed the start of ARGYLL EQUITIES.

20     31.  As a result of numerous civil judgments against FIT Management and/or

21  MCCLAIN, SR., MCCLAIN, SR. did not publically own ARGYLL EQUITIES, but instead

22  operated for the company as a consultant and secret owner.

23     32.  ARGYLL EQUITIES had the appearance of a legitimate financial/stock lender,

24  but operated more akin to a Ponzi scheme, as described in a lawsuit brought by Gerald W.

25  Schlief, Southern District of Texas, Houston Division, C.A. No. 08-cv-2128.  The Gerald W.

26  Schlief lawsuit alleges that MICELI, MCCLAIN SR. and others violated the Racketeer

27  Influenced and Corrupt Organizations Act ("RICO") and committed numerous racketeering

28

JANIS LAW GROUP,
APC

SECOND AMENDED COMPLAINT

1   activities.  The Complaint filed by Gerald W. Schlief is incorporated herein by reference.

2          33.    ARGYLL EQUITIES was used to defraud several investors and/or companies in

3   a stock lending scheme, including but not limited to Gerald W. Schlief, Siko Venture Limited,

4   Louis D. Paolino, Jr., and Servicios Directivos Servia, S.A. de C.V.  Each of these

5   persons/entities brought civil lawsuits against ARGYLL EQUITIES.

6          34.    Upon information and belief, numerous unsatisfied civil judgments exist against

7   ARGYLL EQUITIES, FIT Management, and MCCLAIN, SR. for fraud, the Ponzi scheme

8   described in the Gerald Schlief Complaint, securities fraud and/or stock lending fraud.

9          35.    During ARGYLL EQUITIES' demise as a reputable and financially stable

10  company, through numerous lawsuits and judgments entering against it, ARGYLL EQUITIES'

11  financed the start up of ARGYLL BIOTECH.

12         36.    ARGYLL BIOTECH and/or ARGYLL EQUITIES financed the start up of

13  IMMUNOSYN and financially control IMMUNOSYN.

14         37.    At all relevant time hereto, ARGYLL BIOTECH claimed to own, develop, and

15  promote a drug called SF-1019.

16         38.    At all relevant times hereto, IMMUNOSYN claimed in its SEC filings and

17  website to own the exclusive rights to market and sell SF-1019.

18         39.    Similar to MCCLAIN, SR.'s false and misleading promotion and sale of Nextpath

19  Technologies stock, the DEFENDANTS have engaged in the false and misleading promotion of

20  IMMUNOSYN stock, for financial gain, to the detriment of others.

21         40.    The DEFENDANTS have been promoting IMMUNOSYN stock through various

22  mediums so that they may sell their own stock at a great profit, while investors, such as

23  PLAINTIFFS were unable to sell their stock because it was restricted.

24         41.    Upon information and belief, the DEFENDANTS, personally or through entities

25  that they control, have sold IMMUNOSYN stock from April 2007 through the present totaling

26  more than $14,000,000.

27

28

7

42.     The DEFENDANTS were engaged in a scheme to sell SF-1019 for their own financial gain outside of the exclusive license held by the publically traded company they control, IMMUNOSYN.

43.     The DEFENDANTS distributed SF-1019 and IMMUNOSYN stock certificates interstate through the US mail or other carriers.

44.     The DEFENDANTS used email, websites and telephone communications to sell SF-1019 interstate.

45.     MICELI, MCCLAIN, SR., and MCCLAIN, JR. have been personally involved in the distribution of SF-1019 throughout the United States.

46.     MICELI, MCCLAIN, SR., and MCCLAIN, JR. have been personally involved in the retention of profits from the sale of SF-1019.

47.     MICELI, MCCLAIN, SR., and MCCLAIN, JR. have been personally involved in the development of media statements and promotional statements made on their companies' websites concerning SF-1019.

48.     MICELI, MCCLAIN, SR., and MCCLAIN. JR. control ARGYLL EQUITIES, ARGYLL BIOTECH and IMMUNOSYN.

49.     MICELI, MCCLAIN, SR., and MCCLAIN, JR. have financially stripped ARGYLL EQUITIES and ARGYLL BIOTECH of assets purposely and through the judgments rendered against said companies due to their fraud.  Prior to leaving ARGYLL EQUITIES and ARGYLL BIOTECH "judgment proof," said entities were used by MICELI, MCCLAIN, SR. and MCCLAIN, JR. to commit fraud upon the PLAINTIFFS.

50.     With respect to the operation of ARGYLL EQUITIES and ARGYLL BIOTECH, MICELI, MCCLAIN, SR., and MCCLAIN. JR. have failed to follow corporate formalities, segregate their personal assets from business assets, and make required tax filings for money received by them from the companies and for money paid to employees, consultants, and 1099 labor.

1       51.     MICELI, MCCLAIN, SR., and MCCLAIN, JR. are the alter egos of ARGYLL

2    EQUITIES and ARGYLL BIOTECH.

3                        **The Fraud Upon the Plaintiffs**

4       52.     In early 2006, ALBERGO was introduced by Dr. Jochen Brenner to MICELI and

5    MCCLAIN, SR.

6       53.     In early 2006, through a series of telephone calls and mailings between MICELI

7    and/or MCCLAIN, SR. on the one hand, and ALBERGO on the other hand in Florida,

8    ALBERGO was convinced by MICELI and MCCLAIN, SR. that he should make a financial

9    investment in a start-up company because the start-up company had an exclusive right to sell a

10   super drug called SF-1019.

11      54.    During these initial telephone calls during 2006 with ALBERGO, concerning the

12   efficacy of SF-1019, MCCLAIN, SR. held himself out to be the Chief Science Officer of

13   ARGYLL BIOTECH and a **medical doctor** trained in England.

14      55.    Also during these phone calls, MCCLAIN, SR. and MICELI told ALBERGO that

15   the start-up company was the next Google, that SF-1019 cured multiple sclerosis and diabetic

16   skin ulcers, that SF-1019 had no side effects and that it was totally safe, that SF-1019 would be

17   given orphan status because of its effectiveness and that such would lead to expedited FDA

18   approval, and that they had studies to conclusively prove the effectiveness of SF-1019, but that

19   the studies were not yet ready for publication.

20      56.    During these same telephone calls during early 2006, with ALBERGO

21   participating from Florida, MCCLAIN, SR. and MICELI told ALBERGO that the money they

22   wanted him to invest would be used to fund the start-up operations of the start-up company,

23   that the start-up company would definitely be listed on the NASDAQ shortly after its public

24   offering, that an Osmond family member had invested millions of dollars in the start-up

25   company, and that one of the Osmond brothers' multiple sclerosis was dramatically improved by

26   taking SF-1019.

27      57.    Separate from the phone calls with MICELI, MCCLAIN, SR. also claimed over

28

SECOND AMENDED COMPLAINT

1  the telephone to ALBERGO in Florida, that studies had been completed in Utah and Mexico on

2  SF-1019 with "unbelievable success" and that SF-1019 was going to be approved in Malaysia in

3  the short term.

4       58.     MCCLAIN, SR. and MICELI told ALBERGO that he would receive stock

5  certificates in the start-up company shortly after making his investment.

6       59.     Prior to making his purchases detailed below, MCCLAIN, SR. and MICELI told

7  ALBERGO over the telephone in Florida that stock in the startup company was being sold for

8  $10/share, but that the opening price of the stock would be $15.50/share.

9       60.     On or about March 13, 2006, ALBERGO signed two documents entitled

10  "Agreement for the Purchase of Common Stock," to purchase sixty thousand shares of

11  unrestricted stock in a company to be called "Nurovysn Biotech Corporation" for $600,0000

12  from a company called Argyll Equities, LLC (hereinafter "First Argyll Contracts").  <u>See</u> Exhibit

13  A hereto.

14       61.     On or about March 13, 2006, relying upon the representations of MICELI and

15  MCCLAIN, SR., ALBERGO paid $600,000 to ARGYLL EQUITIES pursuant to the First Argyll

16  Contracts.

17       62.     Pursuant to the First Argyll Contracts, ARGYLL EQUITIES was to "sell, transfer

18  and assign" sixty thousand shares of "free-trading shares of common stock in Nurovysn Biotech

19  Corporation" to ALBERGO within 45 days of receipt of the purchase funds.

20       63.     On or about March 24, 2006, relying upon the representations of MICELI,

21  MCCLAIN, SR. and Mr. Brenner, ALBERGO paid $400,000 to Mr. Brenner via wire transfer

22  for an additional 40,000 shares of unrestricted stock in "Nurovysn Biotoech Corporation"

23  bringing his total investment in the company to $1,000,000.

24       64.     ALBERGO was not provided with any SEC filings for Nurovysn Biotoech

25  Corporation prior to making his purchase of 100,000 shares.

26       65.     ARGYLL EQUITIES breached the First Argyll Contracts by failing to deliver

27  any of the free-trading shares of common stock to ALBERGO within 45 days of receipt of

28

SECOND AMENDED COMPLAINT

1   ALBERGO's purchase funds.

2       66.   During December 2006, ALBERGO was presented with a "Rescission

3   Agreement" document in-person by Dr. Brenner and asked to sign it in order to facilitate getting

4   the stock he purchased during March 2006.  Leading up to December 2006, ALBERGO had

5   been calling Dr. Brenner, MCCLAIN, SR. and MICELI since paying for stock in March 2006 to

6   learn why he had not received it during April 2006, as was represented to him prior to his

7   purchase being made.  During December 2006, ALBERGO was frustrated that he had not timely

8   received the stock but was still encouraged about the new company because of the continuing

9   positive information coming from MCCLAIN, SR. and Dr. Brenner.  When Dr. Brenner

10  presented the "Rescission Agreement" to ALBERGO during December 2006, Dr. Brenner told

11  ALBERGO that by signing it, he was sure to get either the stock or his money back immediately.

12  ALBERGO was not given a copy of the Rescission Agreement by Dr. Brenner.

13      67.   The Rescission Agreement required that ARGYLL EQUITIES "immediately

14  return all consideration and deliveries made pursuant to the [First Argyll Contracts] to restore the

15  parties to their respective positions . . . without limitation, the return by Argyll Equities to

16  [ALBERGO] of the Purchase Funds."  See Exhibit B hereto.

17      68.   ARGYLL EQUITIES failed to "return all consideration" immediately to

18  ALBERGO, and in fact failed to return immediately any portion of such consideration to

19  ALBERGO, including any portion of his purchase funds.

20      69.   In early 2006, Dr. Jochen Brenner represented to IRWIN that he was selling stock

21  in a company called Nurovysn Biotech Corporation that was the sole licensee of a new wonder

22  drug.

23      70.   Based upon representations during early 2006 by Dr. Brenner to IRWIN made in

24  Florida that Nurovysn Biotech Corporation (nka IMMUNOSYN) had exclusive rights to make

25  and sell a new drug that cured severe cases of diabetes, statistical studies and doctor's

26  recommendations presented by Dr. Brenner to IRWIN, the imminent nature of the success of the

27  new company as represented to IRWIN by Dr. Brenner, and the representation that the stock

28

11

1    could be bought for $10/share but would go public for $15.50/share, IRWIN purchased $25,000

2    worth of stock in the start-up company from ARGYLL EQUITIES pursuant to a written

3    agreement.  See Exhibit C hereto.

4         71.    Prior to IRWIN's purchase on or about April 2006, Dr. Brenner represented over

5    the phone to IRWIN within the State of Florida that the company first identified as Nurovysn

6    Biotech Corporation (nka IMMUNOSYN) would obtain approval for the sale of SF-1019 in the

7    United States in 1 to 2 weeks and that the stock would be trading in the same time frame.

8         72.    Dr. Brenner has acted as an agent of MCCLAIN, SR. and MICELI to promote

9    and sell Nurovysn Biotech Corporation (nka IMMUNOSYN) stock and to further their goals as

10   set forth in the written "Partnership Agreement."  Further, MICELI has held out Dr. Brenner as

11   an employee of ARGYLL BIOTECH.

12        73.    Dr. Brenner represented and disclosed to IRWIN that he was selling stock for

13   ARGYLL EQUITIES and that the information he was providing to IRWIN and others, including

14   ALBERGO, came from MCCLAIN, SR. and MICELLI.

15        74.    On or about April 2006, relying upon the representations of Dr. Brenner, IRWIN

16   paid $25,000 to ARGYLL EQUITIES for stock in a company called Nurovysn Biotech

17   Corporation (nka IMMUNOSYN).

18        75.    From March-April 2006 through to the present, MCCLAIN, SR. has continued to

19   promote SF-1019 to ALBERGO, claiming its imminent success and that the stock is about to

20   "take off."

21        76.    After signing the Rescission Agreement, ALBERGO continued to question Dr.

22   Brenner and MCCLAIN, SR. as to when he would receive his stock.  In response to his inquiries,

23   MCCLAIN, SR. and Dr. Brenner both reassured ALBERGO that his long promised stock would

24   be delivered immediately.  They also continued to tell ALBERGO about the prospects for the

25   new company and provided additional written information to support said prospects, like an

26   email during March 2007 that stated the new company had $26,000,000 a month in orders in

27   place.

28

SECOND AMENDED COMPLAINT

77.     On March 26, 2007, still prior to the receipt of the stock certificates by IRWIN and ALBERGO, Dr. Brenner represented to IRWIN and ALBERGO, based upon information supplied by MCCLAIN, SR. and MICELI, that SF-1019 was approved for sale in Canada and that orders had been received for 130,000 vials per month at $200.00/vial and that the stock would be cleared for trading on April 3, 2007.

78.     On or about May 7, 2007, IRWIN and ALBERGO received a letter from MICELI enclosing copies of the long promised stock certificates for the purchases made in 2006.  The May 7, 2007 letter required that IRWIN and ALBERGO sign a Stock Purchase Agreement to receive their original certificates (the "Second Argyll Contracts").  See Exhibit D hereto.

79.     The Second Argyll Contracts contained terms and conditions not set forth in the First Argyll Contracts.  ARGYLL EQUITIES and MICELI pulled a bait and switch by now disclosing in the pages within the Second Argyll Contracts that the shares of stock being purchased by ALBERGO and IRWIN were restricted stock and by providing reference to SEC filings that were not entirely consistent with the prior and ongoing representations being made to ALBERGO and IRWIN.  The SEC filings were not alarming to ALBERGO and IRWIN to the extent inconsistent with the verbal representation being made to them because MICELI, MCCLAIN, SR. and/or Dr. Brenner were representing to ALBERGO and IRWIN that the positive information available to them could not yet be made available to the public.

80.     Based upon the representations supra, the repeated representations as to the imminent success of IMMUNOSYN and the efficacy of SF-1019, and given the requirement that they sign the Second Argyll Contracts to receive their original stock certificates that had been paid for approximately a full year prior, IRWIN and ALBERGO executed the Second Argyll Contracts.

81.     ALBERGO reasonably relied upon the aforementioned representations made by MICELI, MCCLAIN, SR., and Dr. Brenner in purchasing IMMUNOSYN stock from them and/or their company, ARGYLL EQUITIES, and in entering into the First Argyll Contracts, the Rescission Agreement and the Second Argyll Contracts.

SECOND AMENDED COMPLAINT

82.     IRWIN reasonably relied upon the aforementioned representations made by Dr. Brenner in purchasing IMMUNOSYN stock from ARGYLL EQUITIES, and in entering into the First Argyll Contracts, the Rescission Agreement and the Second Argyll Contracts.

83.     ALBERGO and IRWIN continued to hold their IMMUNOSYN stock because of the continuing positive representations by MCCLAIN, SR., MICELI, and Dr. Brenner after the purchase of said stock and because of the representations made on IMMUNOSYN's website and ARGYLL BIOTECH's website.

84.     Recently, MICELI represented to ALBERGO, IRWIN and others that a New York firm was involved in the imminent purchase of IMMUNOSYN stock for $20/share (the "Buyout").

85.     Separately, IMMUNOSYN reported that the Buyout was unsubstantiated market rumors.

86.     MICELI was personally involved in creating market rumors concerning a Buyout for his own financial gain and to cause ALBERGO, IRWIN, and others to continue to hold their IMMUNOSYN stock and to delay legal action against him.

87.     IMMUNOSYN has reported no revenue for 2007 and 2008.  IMMUNOSYN's 10-Q dated May 15, 2008 claims, "As of the date of this report, we have no revenue and limited operations."  This 10-Q is signed by MCCLAIN and FERRONE.

88.     SF-1019 has been sold for a profit and/or revenue in the United States during at least 2008.

89.     The DEFENDANTS have been selling SF-1019 through various commercial channels, including Dr. Morales in Texas, and the DEFENDANTS have failed to report and/or allocate income to IMMUNOSYN to the detriment of its stockholders, including PLAINTIFFS, in violation of IMMUNOSYN's exclusive right to market and sell SF-1019.

90.     The SEC filings made by IMMUNOSYN, as reported and/or signed by MCCLAIN and FERRONE, have been false and/or misleading because SF-1019 is being sold by the DEFENDANTS.

14

1

2 **COUNT I – THE EXCHANGE ACT**

3 (Against MICELI, MCCLAIN, SR., MCCLAIN, JR., IMMUNOSYN, and FERRONE)

4 91. PLAINTIFFS hereby incorporate and restate herein the foregoing paragraphs 1-90

5 as if fully stated herein.

6 92. The DEFENDANTS are in violation of 15 U.S.C. § 78r and/or 17 C.F.R. §

7 240.10b-5 by making false and/or misleading statements concerning IMMUNYSON and SF-

8 1019 in SEC filings, including but not limited to: a) failing to report income generated from the

9 sale of SF-1019, b) claiming in SEC filings made January 3, 2007 that IMMUNYSON had the

10 "exclusive worldwide license to market, distribute and sell . . . SF-1019," and c) failing to

11 disclose that SF-1019 was being sold through channels outside of IMMUNYSON.

12 93. ALBERGO and IRWIN relied upon the SEC filings of IMMUNOSYN to

13 accurately report the financials of the company, material events, and the assets/licenses held by

14 IMMUNOSYN.

15 94. Based upon the numerous representations set forth *supra* and MCCLAIN, SR. and

16 MICELI's claim that IMMUNOSYN would hold the exclusive license to sell SF-1019,

17 ALBERGO and IRWIN purchased IMMUNOSYN stock from them and/or ARGYLL

18 EQUITIES.

19 95. Based upon the SEC filings and DEFENDANTS' representations, ALBERGO

20 and IRWIN believed that SF-1019 could only be sold by IMMUNOSYN and that proceeds from

21 the sale of SF-1019 would flow to IMMUNOSYN.

22 96. Based upon the SEC filings, the original representations of MICELI and

23 MCCLAIN, SR., and MCCLAIN, SR.'s continuing representations as to the efficacy of SF-1019,

24 ALBERGO and IRWIN continued to hold their stock except for a small portion of ALBERGO's

25 holdings that were sold during the initial drop after public trading began.

26 97. In 2006, when MICELI and MCCLAIN, SR. were attempting to sell

27 IMMUNOSYN stock to ALBERGO and to IRWIN, through Dr. Brenner, neither of them told

28

15

1  ALBERGO or IRWIN that the stock would be restricted stock.  MICELI and MCCLAIN, SR.

2  also failed to disclose that they were selling shares in the "start up company" to others at one

3  dollar ($1.00) per share or other amounts far less than that being paid by ALBERGO and

4  IRWIN.  Had ALBERGO or IRWIN known that others were paying far less per share than them,

5  they would not have purchased the stock from MICELI, MCCLAIN, SR., Dr. Brenner and/or

6  ARGYLL EQUITIES.

7       98.   The stock certificates finally sent to IRWIN and ALBERGO from ARGYLL

8  EQUITIES were restricted stock, preventing the sale of said stock under certain conditions.

9       99.   One or more of the DEFENDANTS are selling SF-1019 without any proceeds

10  flowing to IMMUNYSON.

11       100.   MCCLAIN, SR. has personally visited with individuals in California and Utah to

12  arrange for the sale of SF-1019 to them, outside the exclusive license held by IMMUNOSYN.

13       101.   Individuals have been sold SF-1019, as arranged for by MCCLAIN, SR., with the

14  knowledge and consent of MICELI, MCCLAIN, JR., and FERRONE.

15       102.   MCCLAIN, JR. and FERRONE, with knowledge of the sale of SF-1019, have

16  failed to require that income derived from said sales be attributed to IMMUNOSYN, to the

17  detriment of its stockholders, including IRWIN and ALBERGO.

18       103.   MICELI, MCCLAIN, SR., MCCLAIN, JR. and FERRONE are jointly and

19  severally liable for the aforementioned unlawful conduct committed personally or through their

20  control of others.

21       104.   At this time, IMMUNSOYN stock is trading for under ten cents ($0.10).  The

22  stock purchased by ALBERGO and IRWIN, to the extent retained, is essentially worthless.

23       105.   ALBERGO has suffered approximately $800,000 million in damages and IRWIN

24  has suffered approximately $25,000 in damages as a result of the DEFENDANTS' violations of

25  the Exchange Act.

26       106.   ALBERGO and IRWIN are entitled to compensatory damages in amount to be

27  proven at trial against MICELI, MCCLAIN, SR., MCCLAIN, JR., IMMUNOSYN, and

28

16

SECOND AMENDED COMPLAINT

1  FERRONE, jointly and severally, for their violations of the Exchange Act, plus interest, costs

2  and attorneys fees.

3                    **COUNT II – FRAUD AND FRAUD IN THE INDUCEMENT**

4                    (Against MICELI, MCCLAIN, SR. and ARGYLL EQUITIES, LLC)

5        107.    PLAINTIFFS hereby incorporate and restate herein the foregoing paragraphs 1-

6  106 as if fully stated herein.

7        108.    In violation of common law or statute, MICELI, MCCLAIN, SR., Dr. Brenner ,

8  and through them ARGYLL EQUITIES, LLC, made a number of representations to ALBERGO

9  and IRWIN, *supra*, in order to induce them to purchase IMMUNOSYN stock.

10       109.    The representations made by MICELI, Dr. Brenner, and/or MCCLAIN, SR. at

11  *supra*, were false and/or misleading and MICELI and MCCLAIN, SR. knew said statements

12  were false or misleading when made, because: 1) MCCLAIN, SR. is not a medical doctor, 2) it is

13  not proven that SF-1019 cures multiple sclerosis and diabetic skin ulcers, 3) when stated, no

14  studies existed to conclusively prove the effectiveness of SF-1019, 4) IMMUNOSYN was never

15  listed on the NASDAQ, 5) no Osmond family member invested millions in IMMUNOSYN, 6)

16  SF-1019 was sold outside of IMMUNOSYN's exclusive license, 7) the money paid by

17  ALBERGO was not used for IMMUNOSYN's start-up operations, 8) when stated, there was no

18  proof that SF-1019 had no side effects and that it was totally safe, 9) SF-1019 has not achieved

19  orphan drug status or FDA approval, 10) SF-1019 has not been approved for sale anywhere in

20  the world, 11) no Canadian order was placed for 130,000 vials of SF-1019 per month at

21  $200/vial; 12) the stock opened for trading at $15.00 per share and closed at $9 per share on the

22  opening day; 13) the stock price was being manipulated and inflated by MICELI and

23  MCCLAIN, SR.; 14) the stock was being sold to others for far less than $10/share at the time it

24  was represented to ALBERGO and IRWIN that the offering price was $10/share; 15) the stock

25  was not cleared for trading on April 3, 2007; and 16) upon execution of the Rescission

26  Agreement, ALBERGO was not immediately provided, and there was no intention by MICELI,

27  MCCLAIN, SR., or ARGYLL EQUITIES to immediately provide a return of all consideration

28

17

1    previously paid by ALBERGO.

2        110.    The truth behind the representations made by MICELI, Dr. Brenner and

3    MCCLAIN, SR. was concealed from PLAINTIFFS and such concealment and lack of

4    knowledge by PLAINTIFFS should toll the statute of limitations with respect to said claims of

5    fraud and fraudulent inducement.

6        111.    If PLAINTIFFS had not been provided with false and/or misleading information

7    by MICELI and/or MCCLAIN, SR., they would not have purchased IMMUNOSYN stock from

8    them and/or their company, ARGYLL EQUITIES, and ALBERGO would not have executed the

9    Rescission Agreement.

10       112.    ALBERGO reasonably relied upon the DEFENDANTS' material representations

11   in purchasing and continuing to hold IMMUNOSYN stock, and in executing the Rescission

12   Agreement.

13       113.    As a result of the purchase of stock in IMMUNYSON, ALBERGO has suffered

14   damages in the amount of about $800,000.

15       114.    IRWIN reasonably relied upon the material representations of Dr. Brenner, all of

16   which proved to be false, in purchasing IMMUNOSYN stock.

17       115.    MICELI and MCCLAIN, SR. knowingly communicated false or misleading

18   information to IRWIN and ALBERGO through Dr. Brenner to induce them to purchase

19   IMMUNOSYN stock.

20       116.    As a result of the purchase of stock in IMMUNYSON, IRWIN suffered damages

21   in the approximate amount of $25,000.

22       117.    ALBERGO and IRWIN are entitled to rescission of the First Argyll Contracts, the

23   Rescission Agreement (as to ALBERGO only), and Second Argyll Contracts and restitution of

24   monies paid under said agreements, damages for fraud, including direct, consequential and

25   punitive damages, plus interest, costs and attorneys fees.

26       118.    The conduct of MICELI and MCCLAIN, SR., as alleged above, was oppressive,

27   fraudulent and malicious and was committed willfully and/or with reckless disregard for the

28

JANIS LAW GROUP,
APC                SECOND AMENDED COMPLAINT

1  rights of PLAINTIFFS, and without just cause or excuse.  Accordingly, PLAINTIFFS are

2  entitled to exemplary damages in an amount to be determined at trial.

3  **COUNT III – BREACH OF CONTRACT**

4  (Against ARGYLL EQUITIES, LLC, MICELI and MCCLAIN, SR.)

5  119.    PLAINTIFFS hereby incorporate and restate herein the foregoing paragraphs 1-

6  118 as if fully stated herein.

7  120.    Based upon the false representations *supra*, PLAINTIFFS entered into the "First

8  Argyll Contracts" and the "Second Argyll Contracts" to purchase stock from ARGYLL

9  EQUITIES in a company first called Nurovysn Biotech Corporation and subsequently known as

10  IMMUNSOYN.  Also, based upon false representations that his money would be immediately

11  returned or the stock delivered, ALBERGO entered into the Rescission Agreements.

12  **Albergo Contracts**

13  121.    MICELI and MCCLAIN, SR. told ALBERGO that his stock certificates would be

14  delivered to him immediately after his investment, that the stock would go public immediately

15  after his investment and become listed on the NASDAQ, that approvals for SF-1019 would be

16  achieved imminently from the FDA, that his money would be used for the start-up company

17  operations, and that IMMUNOSYN would have the exclusive right to sell SF-1019.

18  122.    The First Argyll Contracts indicated that ALBERGO would receive unrestricted

19  stock in a company called Nurovysn Biotech Corporation.

20  123.    ALBERGO never received the unrestricted stock in Nurovysn Biotech

21  Corporation within the agreed time frame.

22  124.    ARGYLL EQUITIES and MICELI breached the First Argyll Contracts by failing

23  to deliver the stock as promised.

24  125.    In December 2006, back dated by ARGYLL EQUITIES' agents to May 2006, a

25  Rescission Agreement was presented to ALBERGO for signature which voided the First Argyll

26  Contracts and promised the immediate return of ALBERGO's purchase money.

27  126.    ARGYLL EQUITIES and MICELI breached the Rescission Agreement by failed

28  

19

SECOND AMENDED COMPLAINT

1    to immediately return ALBERGO his purchase funds of $600,000.

2        127.    The Second Argyll Contracts said that ALBERGO would receive restricted stock

3    in a company called IMMUNOSYN.

4        128.    There was no additional consideration for the Second Argyll Contracts.

5        129.    ALBERGO was induced to enter into the Second Argyll Contracts because of the

6    numerous verbal representations set forth *supra* and because he had been out of pocket

7    $1,000,000 for about a year without stock certificates to secure his investment.

8        130.    MICELI and MCCLAIN, SR. fraudulently induced ALBERGO to enter into the

9    Second Argyll Contracts and breached their oral promises with respect to the use of his

10   investment and the accomplishment of material events, as represented and set forth above.

11                              **Irwin Contracts**

12       131.    At the direction of, and based on representations by, MICELI and MCCLAIN,

13   SR., Dr. Brenner told IRWIN that his stock certificates would be delivered to him immediately

14   after his investment, that the stock would go public immediately after his investment and become

15   listed on the NASDAQ, that approvals for SF-1019 would be achieved imminently from the

16   FDA, and that IMMUNOSYN would have the exclusive right to sell SF-1019.

17       132.    Based upon the promises and representations set forth *supra*, IRWIN agreed to

18   pay for stock in a company now known as IMMUNOSYN and ARGYLL EQUITIES agreed to

19   deliver unrestricted stock to him in the new company.

20       133.    ARGYLL EQUITIES breached the agreement with Irwin by failing to send him

21   unrestricted stock certificates immediately after his investment.

22       134.    MICELI and MCCLAIN, SR. induced IRWIN to sign the Second Argyll

23   Contracts based upon continuing misrepresentations through Dr. Brenner, including but not

24   limited to, the representations that the stock would open at $15.50/per share and that the stock

25   had been approved for sale in Canada and that an order for 130,000 vials per month at $200/vial

26   had been placed.

27       135.    PLAINTIFFS have been harmed by MICELI, MCCLAIN. SR. and ARGYLL

28

SECOND AMENDED COMPLAINT

1   EQUITIES breaches and by the false statements made to induce PLAINTIFFS to enter two

2   variations of stock purchase agreements and a Rescission Agreement as to ALBERGO.

3          136.    PLAINTIFFS are entitled to damages in amount to be proven at trial against

4   MICELI, MCCLAIN, SR., and ARGYLL EQUITIES, LLC. for their breaches, plus interest,

5   costs and attorneys fees.

6                   **COUNT IV – VIOLATION OF RICO**

7               (Against MICELI, MCCLAIN, SR. and MCCLAIN, JR.)

8          137.    PLAINTIFFS hereby incorporate and restate herein the foregoing paragraphs 1-

9   136 as if fully stated herein.

10        138.    MICELI, MCCLAIN, SR. and MCCLAIN, JR., operate as an enterprise through

11   various entities as described *supra* and through their association and agreement to make money.

12        139.    MICELI, MCCLAIN, SR. and MCCLAIN, JR., have engaged in a pattern of

13   racketeering activity and stock fraud, to the detriment of others, including ALBERGO and

14   IRWIN.

15        140.    MICELI, MCCLAIN, SR. and MCCLAIN, JR., have engaged in monetary

16   transactions (including but not limited to the creation of IMMUNOSYN and ARGYLL

17   BIOTECH) with money derived from unlawful activities and/or racketeering activity in prior

18   enterprises.

19        141.    MICELI and ARGYLL EQUITIES mailed ALBERGO and IRWIN their stock

20   certificates after May 2007, in furtherance of the fraud committed upon them.

21        142.    MICELI and MCCLAIN, SR. agreed to and have committed mail fraud by

22   sending stock certificates and contracts through the mail to more than two individuals, including

23   ALBERGO, IRWIN, and Eleanor Rabin, based upon false representations and in furtherance of

24   the fraud described *supra*.  <u>See</u> Exhibit D hereto.

25        143.    MICELI and MCCLAIN, SR. agreed to and have committed wire fraud by

26   communicating false and misleading statements on more than two occasions via telephone

27   interstate to PLAINTIFFS to induce them to purchase Immunosyn Corporation stock and by

28

   SECOND AMENDED COMPLAINT

1  causing them to send money via wire transfer interstate to a bank account for the benefit of

2  MCCLAIN, SR., MICELI, and/or ARGYLL EQUITIES.

3      144.   MICELI separately mailed between May 2007 and February 2008 numerous

4  Immunosyn Corporation stock certificates in more than two separate mailings to individuals

5  residing in Texas and Florida based upon false representations to induce the purchase of said

6  IMMUNOSYN stock from MICELI, MCCLAIN, JR., MCCLAIN, SR. and their companies in

7  furtherance of the fraud described *supra*.

8      145.   MICELI and MCCLAIN, JR. acted in furtherance of MCCLAIN, SR.'s separate

9  wrongful conduct described *supra* by supplying the stock that MCCLAIN, SR. was selling and

10  by sharing in the profits from the sale of said stock.

11      146.   As a result of the unlawful conduct and RICO violations committed by MICELI,

12  MCCLAIN, SR. and MCCLAIN, JR., ALBERGO and IRWIN have been damaged.

13      147.   As a result of the unlawful conduct and RICO violations committed by MICELI,

14  MCCLAIN, SR. and MCCLAIN, JR., ALBERGO and IRWIN are entitled to compensatory

15  damages in an amount to be proven at trial, treble damages, interest, costs and attorneys fees.

16              **COUNT V – CONSPIRACY TO VIOLATE RICO**

17              (Against MICELI, MCCLAIN, SR. and MCCLAIN, JR.)

18      148.   PLAINTIFFS hereby incorporate and restate herein the foregoing paragraphs 1-

19  147 as if fully stated herein.

20      149.   RICO prohibits any person from conspiring to violate RICO.

21      150.   MICELI, MCCLAIN, SR. and MCCLAIN, JR. had agreements and/or

22  understandings with each other to engage in racketeering activities.

23      151.   MICELI, MCCLAIN, SR. and MCCLAIN, JR. have committed racketeering

24  activities and acts in furtherance of said wrongful and fraudulent activities.

25      152.   ALBERGO and IRWIN were harmed by MICELI, MCCLAIN, SR. and

26  MCCLAIN, JR.'s conspiracy to violate RICO and have suffered actual damages.

27      153.   As a result of MICELI, MCCLAIN, SR. and MCCLAIN, JR.'s unlawful

28

SECOND AMENDED COMPLAINT

1   conspiracy to commit RICO violations, ALBERGO and IRWIN are entitled to compensatory

2   damages in an amount to be proven at trial, treble damages, interest, costs and attorneys fees.

3   **COUNT VI – CIVIL CONSPIRACY**

4   (Against all DEFENDANTS)

5   154.   PLAINTIFFS hereby incorporate and restate herein the foregoing paragraphs 1-

6   153 as if fully stated herein.

7   155.   The DEFENDANTS entered into an agreement with each other to commit one or

8   more unlawful acts, including fraud and fraud in the inducement, against ALBERGO and

9   IRWIN.

10   156.   Through the DEFENDANTS' conspiracy and fraud, set forth *supra*, ALBERGO

11   and IRWIN were sold IMMUNOSYN stock based upon numerous misrepresentations.

12   157.   ALBERGO and IRWIN were harmed by the DEFENDANTS' conspiracy and

13   fraud, and as a result thereof have suffered actual damages.

14   158.   As a consequence of the DEFENDANTS' conspiracy and fraud, ALBERGO and

15   IRWIN are entitled to compensatory damages in an amount to be proven at trial, plus interest,

16   costs and attorneys fees.

17   159.   The conduct of DEFENDANTS, as alleged above, was oppressive, fraudulent and

18   malicious and was committed willfully and/or with reckless disregard for the rights of

19   PLAINTIFFS, and without just cause or excuse.  Accordingly, PLAINTIFFS are entitled to

20   exemplary damages in an amount to be determined at trial.

21   **COUNT VII – UNJUST ENRICHMENT**

22   (Against MICELI, MCCLAIN, SR. and ARGYLL EQUITIES)

23   160.   PLAINTIFFS hereby incorporate and restate herein the foregoing paragraphs 1-

24   159 as if fully stated herein.

25   161.   MICELI, MCCLAIN, SR. and ARGYLL EQUITIES have been unjustly enriched

26   by the sale of IMMUNYSON stock to ALBERGO and IRWIN to the extent of the profit

27   received from the sale of said stock, and each said DEFENDANT should be required to disgorge

28

23

1    that amount.

2         162.    As a consequence, PLAINTIFFS are entitled to compensatory damages in an

3    amount to be proven at trial, plus interest, costs and attorneys fees.

4                    **COUNT VIII – FRAUDULENT TRANSFER**

5                 (Against THOMAS ROAD COMPANY and DONA MICELI)

6         163.    PLAINTIFFS hereby incorporate and restate herein the foregoing paragraphs 1-

7    162 as if fully stated herein.

8         164.    The THOMAS ROAD COMPANY is the alter ego of MICELI because MICELI

9    has used the THOMAS ROAD COMPANY to pay personal expenses and there being no

10   legitimate business purpose for said entity separate from the personal life of MICELI.

11        165.    The THOMAS ROAD COMPANY never performed any work for ARGYLL

12   EQUITIES, yet during 2006 and 2007 it received money from ARGYLL EQUITIES without

13   providing any value in exchange, said monies being used to pay the personal expenses of

14   MICELI.

15        166.    ARGYLL EQUITIES is insolvent due to substantial judgments being obtained

16   against it by creditors and was insolvent at the time it received funds from the PLAINTIFFS.

17        167.    PLAINTIFFS have been damaged by the fraudulent transfer of money from

18   ARGYLL EQUITIES to the THOMAS ROAD COMPANY.

19        168.    DONA MICELI never worked for ARGYLL EQUITIES.

20        169.    Since 2006, DONA MICELI received over $1,000,000 from ARGYLL

21   EQUITIES.

22        170.    DONA MICELI has failed to report money received from ARGYLL EQUITIES

23   to the IRS as income.

24        171.    Assets of ARGYLL EQUITIES have been transferred to DONA MICELI without

25   providing reasonably equivalent value in exchange to ARGYLL EQUITIES and with the intent

26   to hinder and prevent collection by PLAINTIFFS and other creditors because of ARGYLL

27   EQUITIES' insolvency.

28

JANIS LAW GROUP,
APC          SECOND AMENDED COMPLAINT

172.    JAMES MICELI was the beneficial owner of over 12,710,000 shares of Immunosyn Corporation stock that he deposited in a offshore company called Cuxhaven Holdings, Ltd.

173.    On or about November 13, 2007, JAMES MICELI transferred through Cuxhaven Holdings, Ltd. 12,710,000 shares of Immunosyn Corporation stock to his wife, DONA MICELI, for no consideration in return and with the intent to hinder and prevent collection by PLAINTIFFS and other creditors because of JAMES MICELI's impending insolvency.

174.  At the time of the transfer, the Immunsoyn Corporation stock was valued at $5.55 per share, making the aggregate transfer to DONA MICELI valued at $70,540,500.

175.  Sometime during 2010, JAMES MICELI agreed to the entry of a $69,000,000 judgment against him in favor of T. Paul Buhlman based upon prior stock lending fraud alleged by Mr. Buhlman.

176.    PLAINTIFFS have been damaged by the fraudulent transfer of money from ARGYLL EQUITIES to DONA MICELI and from JAMES MICELI through Cluxhaven Holdings, Ltd. to DONA MICELI.

177.    PLAINTIFFS did not have knowledge of the fraudulent transfers to the THOMAS ROAD COMPANY and DONA MICELI until their review of this subject complaint, prior to filing same, and said transfers were concealed from them by the DEFENDANTS.

178.    PLAINTIFFS did not have knowledge of any judgment against ARGYLL EQUITIES or pending lawsuits against ARGYLL EQUITIES until August of 2009 and said lawsuits and judgments were concealed from them by the DEFENDANTS.

179.    ALBERGO would not have invested any money with ARGYLL EQUITIES if MICELI or MCCLAIN, SR. had disclosed to him the extent and nature of the lawsuits it was involved in and the existence of unsatisfied judgments against MCCLAIN, SR.

180.    The statute of limitations regarding said fraudulent transfers should be tolled, with respect to PLAINTIFFS.

181.   As a consequence of the fraudulent transfers to THOMAS ROAD COMPANY and DONA MICELI, PLAINTIFFS are entitled to imposition of a constructive trust over all transferred amounts, compensatory damages in an amount to be proven at trial, plus interest, costs and attorneys fees.

## PRAYER FOR RELIEF

**WHEREFORE,** PLAINTIFFS pray for judgment against DEFENDANTS, and each of them, in favor of PLAINTIFFS as follows:

On Counts I, III, and VII:

1.  For compensatory damages according to proof;

On Count II:

1.  For rescission and restitution as a result of the fraudulent inducement;

2.  For compensatory damages according to proof;

3.  For punitive damages;

On Count IV and V:

1.  For compensatory damages according to proof;

2.  For treble damages;

On Count VI:

1.  For compensatory damages according to proof;

2.  For punitive damages;

On Count VIII:

1.  For a constructive trust on all amounts transferred;

2.  For compensatory damages according to proof;

On All Counts:

1.  For a pre-judgment order of attachment against the real and personal property of JAMES MICELI and/or DONA MICELI that may be found and attached to the extent of $600,000 in the State of California;

2.  For prejudgment interest;

SECOND AMENDED COMPLAINT

1        3.  For costs of suit incurred herein;

2        4.  For reasonable attorneys' fees; and

3        5.  For such other and further relief as the Court deems just and proper.

4

5    Dated:  April 26, 2011

6                  **LAW OFFICES OF ANDREW J. TINE**

7              By: /s/Andrew J. Tine

8                  Andrew J. Tine
              251 Thames Street, 2nd Floor

9                  Bristol, RI 02809
              Tel: 401.396.9002

10                 Fax: 401.396.9479
              Email: atine@tinelaw.com

11

12              J A N I S   L A W   G R O U P

13              A PROFESSIONAL CORPORATION

14             By:   /s/ Dean T. Janis

15             Dean T. Janis
          JANIS LAW GROUP, APC

16             550 West C Street, Suite 2000
          San Diego, CA 92101

17             Tel: (619) 814-3526
          Fax: (619) 955-5318

18             Email: dean.janis@janislaw.net

19             Counsel for Plaintiffs
          ROBERT ALBERGO and DAVID IRWIN

20                **<u>CERTIFICATE OF SERVICE</u>**

21         I hereby certify that a copy of the foregoing document was filed electronically and served

22   by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail
to all parties below by operation of the court's electronic filing system or by mail to anyone

23   unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may
access this filing through the court's CM/ECF System.

24

25                 /s/ Andrew J. Tine

26

27

28

              27

SECOND AMENDED COMPLAINT